LAWRENCE JAMES ROSENBERG, BY HIS GUARDIAN AD LITEM, LAWRENCE GLENN ROSENBERG, AND LAWRENCE GLENN ROSENBERG, INDIVIDUALLY, PLAINTIFFS-APPELLANTS, v. MICHAEL J. CAHILL, M.D., AND RICHARD MCCARTHY, M.D., DEFENDANTS, AND BRUCE MCELWAIN, D.C., DEFENDANT-RESPONDENT.

Argued September 11, 1984—Decided May 13, 1985.

*Louis F. Locascio* argues the cause for appellant (*Drazin and Warshaw,* attorneys; *Steven L. Kessel,* on the brief).

*Stuart V. Brod* argued the cause for respondent (*Pillsbury & Russell,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This appeal arises from an action for personal injuries assertedly caused by the professional malpractice of a chiropractor. The issues raised call for our consideration of the nature and extent of the professional duty of care that a chiropractor owes to a patient as to matters that in some respects fall outside the scope of chiropractic practice. The more specific question presented is whether a chiropractor is under a duty to recognize from a patient's x-ray the presence of observable soft tissue abnormalities, the actual diagnosis and treatment of which are properly within the field of medicine. In answering this question we must consider whether a medical doctor is competent to express an expert opinion as to the professional duty of care governing chiropractors, and if so, whether the evidence in this case was sufficient to create a triable issue that the defendant, a chiropractor, breached that duty.

## I.

The plaintiffs in this case are Lawrence James Rosenberg, an infant, and his father, Glenn Rosenberg. They brought a complaint charging malpractice against a chiropractor, Bruce McElwain, and two medical doctors specializing in pediatrics. Each of these licensed practitioners had treated Lawrence at various times during a period of approximately one-and-a-half years before he was diagnosed as suffering from Hodgkin's disease. The complaint alleged that defendants had negligently failed to make an early diagnosis of the disease.[1]

Plaintiffs' complaint against defendant McElwain asserted that during his treatment of Lawrence, he took x-rays of

---

[1]One of the medical doctors had been seeing Lawrence for about a month when he made a diagnosis of lymphoma. Lymphoma is "[a] term used to designate a group of related diseases involving the lymph tissues including Hodgkin's disease." 2 J. Schmidt, *Attorney's Dictionary of Medicine* L–131 (1983). The complaints against the medical doctors are not the subject of this appeal.

plaintiff's spine, but failed to notice soft tissue abnormalities that were disclosed on the x-rays. Plaintiffs further charged that defendant negligently failed to refer Lawrence to a medical doctor competent to diagnose and treat these abnormalities. As a result of these alleged acts of malpractice, plaintiffs contended that Lawrence suffered an unreasonable delay in obtaining a proper diagnosis and timely treatment of his condition. Defendant denied any negligence.

Following the completion of discovery, defendant brought a motion for summary judgment. The record on the motion indicated that defendant McElwain first saw the infant plaintiff Lawrence on August 22, 1980. According to defendant, the only symptoms mentioned by Lawrence were some difficulty in moving his head and occasional headaches, which were related to an injury that Lawrence had sustained while trampolining. Plaintiffs, on the other hand, asserted that Lawrence complained of many more symptoms. Despite this factual difference, however, it is reasonably clear that plaintiffs consulted defendant in his capacity as a chiropractor.

As part of his initial examination, defendant took x-rays of Lawrence, which disclosed evidence of soft tissue abnormalities, i.e., tumors. Nevertheless, defendant failed to observe or recognize these abnormalities. According to his deposition, defendant viewed the x-rays "chiropractically to look for an alteration in the vertebrae." He claimed that he had taken the x-rays only for purposes of chiropractic treatment and that a chiropractor of his "school" or specialty, referred to as "straight chiropractic," was under no duty to notice tissue abnormalities on such x-rays. Plaintiffs countered defendant's allegations with the deposition testimony of a medical doctor to the effect that defendant failed to exercise reasonable care in reading the x-rays. Defendant's treatment of Lawrence consisted of "adjustment," that is, manual manipulation of the spine for the purpose of "replacing" the subluxated vertebra. Lawrence was seen on five subsequent dates by defendant, the last being November 28, 1980. Having failed to recognize the

soft tissue abnormalities that were shown by the x-rays, defendant did not refer his patient to a medical doctor for further examination, diagnosis, or treatment of this condition.

The trial court concluded that plaintiffs had not proffered competent proof through a qualified expert as to the applicable duty owed by a chiropractor in the circumstances. Accordingly, it granted defendant's motion for summary judgment, which was affirmed by the Appellate Division. Plaintiffs petitioned this Court for certification, which we granted.

## II.

As noted, plaintiffs offered the testimony of a licensed medical doctor, Dr. Herbert A. Knapp, to establish professional malpractice on the part of defendant. Plaintiffs contended below, as well as before us, that Dr. Knapp, as a medical doctor, was adequately qualified to render an opinion as an expert concerning the professional standard of care owed by a chiropractor in the reading of x-rays. This testimony, according to plaintiffs, was sufficient to demonstrate the duty of care owed by a chiropractor and its breach by defendant.

While the competence of Dr. Knapp's opinion concerning the chiropractic duty of care in these circumstances is presented as the major issue in this litigation, plaintiffs argue in the alternative that any asserted deficiencies in their expert proof were harmless. They contend that the negligence of defendant under the given circumstances could have been determined by a jury drawing upon their common knowledge as laypersons. In effect, plaintiffs assert that, as a matter of common knowledge, x-rays that depict soft tissue abnormalities, such as occurred in this case, can be sufficiently understood by a layperson viewing the x-rays, obviating the need for expert testimony. In light of this contention, the first issue that we consider is whether the common knowledge doctrine is applicable in this case and whether expert testimony was required at all.

It is generally recognized that in the ordinary medical malpractice case "the standard of practice to which [the defendant-practitioner] failed to adhere must be established by expert testimony," and that a jury generally lacks the "requisite special knowledge, technical training and background to be able to determine the applicable standard of care without the assistance of an expert." *Sanzari v. Rosenfeld,* 34 *N.J.* 128, 134–35 (1961). This requirement, that the relevant professional duty must be established by expert testimony, is also generally applicable in malpractice actions against chiropractors. *See Klimko v. Rose,* 84 *N.J.* 496 (1980).

Under the common knowledge doctrine, however, a malpractice case against a licensed professional may present triable issues without resort to the testimony of an expert. In such a case the jury itself is allowed "to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto." *Sanzari v. Rosenfeld, supra,* 34 *N.J.* at 141. The trial of such a case is essentially no different from "an ordinary negligence case." *Id.; see Buckelew v. Grossbard,* 87 *N.J.* 512, 527 (1981). Nevertheless, it is the unusual professional malpractice case in which the common knowledge doctrine can be invoked. *See Hake v. Manchester Township,* 98 *N.J.* 302, 313 (1985).

The basic postulate for the application of the common knowledge doctrine in a malpractice action "is that the issue of negligence is not related to technical matter peculiarly within the knowledge of the licensed practitioner." *Sanzari, supra,* 34 *N.J.* at 142. The most appropriate application of the common knowledge doctrine involves situations where the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience. *E.g., Sanzari v. Rosenfeld, supra,* 34 *N.J.* at 140; *Magner v. Beth Israel Hosp.,* 120 *N.J.Super.* 529, 533 (App.Div.1972), certif. den., 62 *N.J.* 199 (1973); *Tramutola v. Bortone,* 118 *N.J.Super.* 503, 512–13 (App.Div.1972), rev'd in part on other grounds, 63 *N.J.* 9 (1973);

*Jones v. Stess,* 111 *N.J.Super.* 283, 287–90 (App.Div.1970); *Lewis v. Read,* 80 *N.J.Super.* 148, 170–71 (App.Div.1963); *Becker v. Eisenstodt,* 60 *N.J.Super.* 240 (App.Div.1960); *Toy v. Rickert,* 53 *N.J.Super.* 27 (App.Div.1958); *Steinke v. Bell,* 32 *N.J.Super.* 67 (App.Div.1954); *Gould v. Winokur,* 98 *N.J.Super.* 554 (Law Div.1968), aff'd, 104 *N.J.Super.* 329 (App.Div. 1969).

We have specifically acknowledged that the common knowledge doctrine may be applicable to a malpractice action against a chiropractor. Thus, in *Klimko v. Rose, supra,* the Court pointed out that while expert testimony was required to establish causation, such testimony was not required under the particular circumstances to establish the standard of care applicable to a chiropractor or to establish whether under the circumstances that standard of care had been breached. In that case the conduct of defendant involved a course of treatment entailing the forcible application of pressure against the patient's neck. We concluded that a layperson drawing upon common knowledge and ordinary experience could readily determine without the assistance of an expert whether defendant had acted unreasonably in repeatedly applying pressure to the patient's neck after the patient had already once lost consciousness. 84 *N.J.* at 505.

In this case plaintiffs contend that there was evidence to support the application of the common knowledge doctrine. They assert in effect that "as a matter of common knowledge within the ken of lay jurors," *Buckelew v. Grossbard, supra,* 87 *N.J.* at 527, a person of ordinary intelligence and experience could have determined that the x-rays revealed soft tissue abnormalities. Plaintiff-father testified in depositions that "even to a layman, like myself, when pointed out, could see [from the x-rays] unbelievably how his whole chest was accumulated with these joint balls, you know, called tumors." According to plaintiffs, a jury considering this evidence and itself viewing both "normal x-rays and [Lawrence's] x-rays, may

easily agree with plaintiff's contentions that the abnormalities could not have been missed."

■ We disagree that this evidence provides an adequate basis for applying the common knowledge doctrine. According to the father the tumors appearing in the x-rays were "pointed out" to him, clearly dispelling an inference that these abnormalities would be obvious to a layperson. There is no firm basis on the record in this case to conclude that a layperson would be able to discern the soft tissue abnormalities from the x-rays without the guidance of an expert. *Compare Tramutola v. Bortone, supra,* 118 *N.J.Super.* 503 (expert testimony unnecessary to establish standard of care when x-ray readily revealed presence of foreign object in patient's chest immediately after operation).

We consequently agree with the lower courts that the common knowledge doctrine was not available under these facts and does not obviate the need for competent expert testimony to establish the applicable duty of care with respect to the proper chiropractic practices involved in this case.

### III.

■ The major issue in the case is whether expert proof in the form of an opinion of a licensed medical doctor is competent to establish the chiropractic standard of care in connection with observable physical conditions the actual treatment of which does not fall within the scope of chiropractic. We address this issue in the context of a motion for summary judgment. This adjures us to accept as true all of the proffered material facts that will serve to defeat the motion for summary judgment and to find, if at all possible, a genuine dispute over material facts sufficient to preserve the matter for trial. *Crowe v. De Gioia,* 90 *N.J.* 126 (1982); *Pierce v. Ortho Pharmaceutical Corp.,* 84 *N.J.* 58 (1980); *see also Sanzari v. Rosenfeld, supra,* 34 *N.J.* at 132 (1961) (applying a similar standard for weighing evidence in

determining whether to grant a motion to dismiss a malpractice complaint).

In *Sanzari v. Rosenfeld, supra,* the Court was required to determine whether the plaintiff's expert, a medical doctor, was qualified to testify as to the standard of care owed by a dentist in the administration of general anesthesia during the performance of a dental operation. We recognized that when the subject matter of the expert testimony "falls distinctly within the province of a particular profession," then generally "the [expert] witness must be a licensed member of the profession whose standards he professes to know." 34 *N.J.* at 136. "[T]he license to practice," according to the Court, "imports the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion." *Id.* However, the Court further observed that in areas in which professions "overlap," a member of one profession who is "familiar with the situation in issue" would be competent to testify as to the "accepted practice" applicable to a member of the other profession. *Id.* In that case, we found that the administration of anesthesia was a subject involving "a degree of mutual competence" by both medical and dental practitioners.

In *Klimko v. Rose, supra,* we acknowledged without deciding that a medical doctor in appropriate circumstances could be qualified to testify as to the standard of care owed by a chiropractor in areas that were common to both professions. Consequently our present inquiry must turn to whether the subject of the professional expert opinion in this case implicated matters common to both the medical and chiropractic professions.

Chiropractors and medical doctors are both ultimately concerned with healing the ills of their patients. But because the philosophy of chiropractic is founded on the principle that many human ailments can be treated through manipulation of the spinal column, chiropractors are limited to the practice of that specialty. By statutory definition, the practice of chiropractic

is "a system of adjusting the articulations of the spinal column by manipulation thereof." *N.J.S.A.* 45:9–14.5.

Although chiropractic is philosophically different from and more limited than medical healing, chiropractors have been held to be one type of medical practitioner governed generally under Title 45, which codifies the legislative scheme for all persons involved in the healing fields. *N.J.S.A.* 45:1; *see State Board of Medical Examiners v. Maza*, 9 *N.J.Misc.* 171, 172, 153 A. 259 (Sup.Ct.1931) (1920 and 1921 acts indicated a legislative intent "to label chiropractic as a branch of medicine or surgery"); *State Bd. of Medical Examiners v. Giedroyc*, 91 *N.J.L.* 61, 63 (Sup.Ct.1917) (construing the definition of medical practice found in *L.* 1915, *c.* 271, § 5, a definition similar to the current one in *N.J.S.A.* 45:9–5.1, to include the chiropractic approach). Thus, in the universe of healing arts, chiropractic is a subset of medicine.

The interrelationship between these healing professions is further illustrated by the history of the chiropractic profession's struggle to gain acceptability and official recognition. For many years, no chiropractic school had been approved by the Board of Medical Examiners and very few chiropractors had been licensed under the existing system. New Jersey Legislature, *Joint Committee Hearings to Consider the Question of Whether or Not a Bill Should Be Introduced Creating a Separate Chiropractic Board in the State* 7 (Oct. 24, 1944) (unpublished). Following hearings in 1944 that addressed the issues of chiropractic practice and its regulation, the Legislature continued to include chiropractic in the general scheme of regulation of medicine and surgery. In 1949 a committee appointed by the governor to study the practice of chiropractic in New Jersey issued its report. *Report on Licensing & Regulating the Practice of Chiropractic* (1949). The committee emphasized the common responsibilities of the medical and chiropractic professions and concluded that chiropractors must have the same fundamental education as other medical practitioners. To make sure "that the education and training of all who endeavor to treat the sick should be of the same standard,"

it recommended that separate licensing of chiropractors not be instituted. *Id.* at 23.

In 1953 the Legislature provided for the distinctive regulation of chiropractic. It reaffirmed common standards and elements of the chiropractic and the medical professions. The Legislature incorporated into Title 45 provisions detailing licensing requirements for chiropractors and chiropractic schools. *L.* 1953, *c.* 233, §§ 3–14, *N.J.S.A.* 45:9–14.5, 45:9–41.1 to 45:9–41.-11. Under these sections, which have remained substantially unchanged since 1953, in order to become licensed, a chiropractor must pass a state-administered examination. The examination includes basic subjects such as anatomy, including neurologic and histologic anatomy, physiology, pathology, bacteriology, non-surgical diagnosis, chemistry, hygiene, and the therapeutics of chiropractic. *N.J.S.A.* 45:9–41.5. Many of these subjects are similar to those covered in the examination for the license to practice medicine, although the latter anticipates a greater depth of knowledge. *See N.J.S.A.* 45:9–15.

Educational requirements for the respective professions reflect parallel emphasis on common subjects. In order for a chiropractic school to be approved, its curriculum must include classes in subjects that are in many respects co-extensive with those in a medical school's curriculum. In addition to conducting courses in the principles of chiropractic, the school must teach, among other things, anatomy, embryology, histology, physiology, pathology, bacteriology, chemistry, neurology, gynecology, obstetrics, dermatology and pediatrics. *N.J.A.C.* 13:35–10.9.[2]

---

[2]*N.J.A.C.* 13:35–10.0, promulgated pursuant to *N.J.S.A.* 45:9–41.6 and *N.J.S.A.* 45:9–2 (the general grant of rule-making authority to the Board of Medical Examiners), imposes requirements for approval of chiropractic schools that are more stringent than the statutory requirements. These mandate that the following subjects be covered in a four year course of 3,600 to 4,400 class hours. The percentage refers to the total number of hours over the four years:

With respect to the particular practices involved in this case, namely, the use of x-ray examinations and diagnosis, there is a commonality of education, training, and licensure between the chiropractic and medical professions. Although chiropractic practice is limited to adjustment of the spinal column, and chiropractors may not prescribe, administer, or dispense drugs or perform surgical operations, *N.J.S.A.* 45:9–14.5, chiropractors, like medical doctors, are permitted to use x-rays for the purpose of diagnosis. *Id.* Chiropractic licensure also contemplates considerable education and knowledge on the part of the chiropractic practitioner with respect to the general field of diagnosis, presumably covering conditions that fall within the field of chiropractic as well as those more properly attributed to other licensed healing disciplines.[3]

In this case, applying the analysis of *Sanzari*, it is clear from the statutory and regulatory scheme that there is an overlap between the medical and chiropractic professions with respect to both the use of x-rays and the diagnosis of conditions that may require medical attention. In these areas, a licensed medical practitioner would therefore possess the

| SUBJECT | PERCENTAGE OF TOTAL |
|---|---|
| 1. Anatomy, including dissection wherever possible, embryology and histology | 25% |
| 2. Principles of Chiropractic | 37½% |
| 3. Physiology | 6¼% |
| 4. Diagnosis | 7½% |
| 5. Pathology, Bacteriology and Laboratory Techniques | 8¾% |
| 6. Chemistry | 2½% |
| 7. Neurology | 5% |
| 8. Hygiene | 1¼% |
| 9. Jurisprudence | 1¼% |
| 10. Gynecology, Obstetrics, Spinography Endocrinology, Dermatology, Pediatrics, Special Senses | 5% |
| | 100% |

[3]At least 300 class hours over the four year course of study required for chiropractic must be devoted to diagnosis and symptomatology. *N.J.A.C.* 13:35–10.0.

requisite training and knowledge to express an opinion as an expert. *See Sanzari, supra; see also Janssen v. Mulder,* 232 *Mich.* 183, 205 *N.W.* 159, 162 (1925) (testimony of a medical doctor that there was "a customary and well-known treatment" admitted against chiropractor in action based on failure to recognize infectious disease); *Hilgedorf v. Bertschinger,* 132 *Or.* 641, 285 *P.* 819, 821 (1930) (in dictum, physicians of schools other than the defendant's may be witnesses where there is involved a condition that should be recognized by any physician, for example, dislocation of hip joint); *accord Sheppard v. Firth,* 215 *Or.* 268, 334 *P.*2d 190 (1959) (where issue submitted to jury is whether chiropractor's treatment was negligent, not whether diagnosis was in error, plaintiff's witness must have expertise in chiropractic treatment).

Of course, licensed medical doctors are not always qualified to testify in cases involving the asserted malpractice of a chiropractor. The act of negligence must involve the breach of a duty that the medical doctor can evaluate. When the standard of care is within the doctor's field of expertise, and thus is common to both professions, the doctor would be qualified to testify as an expert on that issue.

In this case, as noted, the asserted negligence involves a failure to recognize from an x-ray an abnormal condition and the failure to refer plaintiff to a practitioner who could diagnose and treat that condition. In such circumstances, we agree with the court in *Mostrom v. Pettibon,* 25 *Wash.App.* 158, 607 *P.*2d 864, 867 (1980) that the appropriate standard of care governing a chiropractor is

(1) to diagnose a medical problem as contrasted with a chiropractic problem; (2) to refrain from further chiropractic treatment when a reasonable chiropractor should be aware that the patient's condition is not amenable to chiropractic treatment and that continuation of such treatment may aggravate the condition; (3) to refer the patient to a medical doctor when a medical mode of treatment is indicated.

*See also Kelly v. Carroll,* 36 *Wash.*2d 482, 219 *P.*2d 79, 85 (1950), *cert.* denied, 340 *U.S.* 392, 71 *S.Ct.* 208, 95 *L.Ed.* 646

("[T]he legislature required drugless healers to pursue certain studies in order that they would know enough *not* to injure patients, and to recognize cases where their limited methods are inefficacious and the services of a doctor are required."); *Janssen v. Holder, supra,* 232 *Mich.* 183, 205 *N.W.* 159 (chiropractor could be found liable for not ascertaining nature of infectious disease); *Ison v. McFall,* 55 *Tenn.App.* 326, 400 *S.W.*2d 243, 258–59 (1964) (where patient complained to chiropractor of loss of the use of the legs and tingling in them, chiropractor could be held to duty of recognizing these as symptoms and recommend further tests); *Walkenhorst v. Kesler,* 92 *Utah* 312, 67 *P.* 2d 654, 664–66 (1937) (because of statutory scheme, defendant could be held responsible for negligent treatment of "human ailments" in general, not just for negligent chiropractic manipulations).

This standard of care applicable to chiropractors is consistent with rules recently adopted by the Board of Medical Examiners "to set forth the minimum standard of practice special to chiropractic." 16 *N.J.R.* 686 (1984). These rules impose a duty on a chiropractor to examine and diagnose a patient to determine whether a condition is appropriate for chiropractic treatment, and, if it is not, to refer the patient to another kind of medical practitioner. *N.J.A.C.* 13:35–7.1(b). The Board's comments indicate that the new rule "embodies and codifies the current standards of practice as observed by the vast majority of the approximately 1,400 chiropractic physicians licensed in New Jersey." 16 *N.J.R.* 686 (1984). The fact that the new rule was not intended to enlarge the prior scope of practice, *see id.* at 3209, strengthens the view that chiropractors have long been expected to diagnose and refer patients whose conditions require medical or other treatment. Moreover, this standard of care reflects the interrelationship and areas of overlap between chiropractic and medicine, which have been evident throughout the evolution of the statutory and regulatory structure governing the practice of chiropractic. "The rule thus protects the public health and welfare by making certain that chiropractic

treatment shall be given only when genuinely justified." *Id.* at 687.

 Accordingly, we are satisfied that a person who is duly licensed as a medical doctor may be competent to express an opinion concerning the standard of care applicable to a chiropractor as to matters that each of these licensed disciplines of medicine and chiropractic share in common in terms of education, training and licensure. In a case such as this, a medical doctor would be competent as an expert concerning the chiropractic use of x-rays and the diagnosis of physical conditions.

## IV.

We now consider the evidence to determine whether there is a genuine dispute of facts material to the issues in this case. This inquiry revolves around whether Dr. Knapp's testimony as an expert presented adequate evidence of the standard of care applicable to a chiropractor relating to the reading of x-rays and the diagnosis of underlying physical conditions, and whether this evidence established a breach by defendant of the duty to act in accordance with this standard.

 It is readily inferable from Dr. Knapp's testimony that, as a licensed medical doctor, he possessed basic knowledge and general experience in both the examination of x-rays and the skills entailed in the diagnosis of patients. While Dr. Knapp acknowledged that he had no special familiarity with the formal curriculum and technique of chiropractic, he nevertheless did have "some knowledge" about chiropractic acquired from "reading." By virtue of his own training and licensure in areas of learning common to chiropractic and medicine, Dr. Knapp would be qualified as an expert to evaluate the expected performance of a chiropractor in recognizing in an x-ray an abnormal condition and referring his patient to a qualified practitioner.

Dr. Knapp's testimony, then, was admissible to assist a jury in determining the appropriate standard of care and whether

the defendant breached his duty to act in accordance with that standard of care. In this respect he testified that even without special training in the diagnosis of soft tissue abnormalities, a professional in the healing sciences with basic or elementary training and general experience in the examination of x-rays should be able to recognize the existence of such abnormalities as were present in this case. Dr. Knapp further explained that it "doesn't require [special] training to discern in any x-ray that there is a difference between radiodensity and radiolucency, which should indicate to the examining physician that an abnormality exists." He concluded, accordingly, that a chiropractor "should [also] be able to recognize an abnormal x-ray if he's taking them."

Dr. Knapp further differentiated between the duty to recognize an abnormality and to diagnose that abnormality. He testified that a chiropractor, who should be able to recognize from an x-ray an abnormal soft tissue condition, was under a duty to refer the patient to a practitioner with the requisite competence to make a proper diagnosis even though the chiropractor himself is unable to diagnose that condition.[4]

The testimony of Dr. Knapp thus posed a genuine dispute as to material facts relating to the standard of care governing a chiropractor in the treatment of a patient and the asserted breach of duty by defendant in this case. Therefore, the case presents matters properly to be resolved by the jury.

For the reasons set forth in the opinion, the judgment below is reversed and the case is remanded for trial.

---

4Dr. Knapp believed that a person trained to examine x-rays only of the spinal column, presumably a chiropractor, should be able to recognize soft-tissue abnormalities. He explained:

> [i]f you're looking at x-rays like this again and again and again, even though you are observing only the spinal column, going under the assumption that most of your patients do not have Hodgkins disease or malignancy, eventually it would be impressed upon many that a normal thoracic area looks a certain way; and, if suddenly he takes one where the thoracic looks different, then he should start to wonder.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POL-LOCK, O'HERN and GARIBALDI—7.

*For affirmance*—None.