244 N.J. Super. 413 (1990)
582 A.2d 1011
BARBARA F. CRESPO, PLAINTIFF-APPELLANT,
v.
EDWARD MCCARTIN, M.D., DEFENDANT-RESPONDENT, AND DR. SMITH AND RED BANK SURGICENTER AND RED BANK SURGICENTER, INC., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 9, 1990.
Decided November 13, 1990.
*414 Before Judges J.H. COLEMAN, ASHBEY and LANDAU.
Richard B. Woods argued the cause for appellant.
Richard A. Grossman argued the cause for respondent (Grossman & Kruttschnitt, attorneys; Richard A. Grossman of counsel; Eli L. Eytan on the brief).
The opinion of the court was delivered by J.H. COLEMAN, P.J.A.D.
*415 This is a medical malpractice case based on an alleged misdiagnosis or failure to diagnose and treat an ectopic pregnancy. A jury found defendant Edward McCartin, M.D., (defendant) committed malpractice and returned a verdict for plaintiff in the sum of $28,000. Defendant filed a motion for judgment n.o.v. At the conclusion of a hearing on the motion, the trial judge determined that plaintiff's expert witness lacked the minimum qualifications to render an opinion respecting the appropriate standard of care and defendant's deviation therefrom. Consequently, judgment n.o.v. was entered in favor of defendant. Plaintiff has appealed, and we affirm the judgment n.o.v.

I
Our careful study of the record satisfies us the following facts are not in serious dispute. Plaintiff, the mother of two daughters, had an IUD inserted in 1981 by Dr. Shangold when she was 26 years old. Following her menstruation period in April 1983, she continued to experience vaginal bleeding and discomfort. Dr. Shangold examined plaintiff on June 2, 1983; he gave her an intravenous injection to stop the bleeding and a prescription for the pain.
Plaintiff next sought medical assistance on June 10, 1983 when she went to the emergency room of Point Pleasant Hospital. There, she complained of vaginal bleeding and abdominal pain. She was examined by defendant, a staff obstetrician and gynecologist. Plaintiff told defendant that she had been examined a few days earlier by Dr. Shangold. Defendant's examination revealed tenderness in the upper right quadrant and in the area of the cervix. Defendant ordered a number of tests, removed the IUD and admitted plaintiff to the hospital. He made a working diagnosis of pelvic inflammatory disease and started to administer an antibiotic while plaintiff was in the emergency room before a series of sophisticated *416 tests were performed. Blood and urine tests results later confirmed defendant's suspicion of urinary tract infection.
On June 10 a quantitative Beta Subunit Human Chorionic Gonadotropin (HCG) test was performed. This procedure utilizes a highly sensitive blood or urine test that detects early pregnancy. The HCG test score was 9027; that suggested a pregnancy of one to three months duration.
The first of three sonograms was performed the same day. This procedure utilizes ultrasound to depict internal organs. The sonogram revealed a small sonolucency within the uterus suggestive of an early gestational sac. The right adnexa, which includes the right ovary and right fallopian tube, was normal. The roentgenologist who interpreted the sonogram stated:
The left tubo-ovarian complex is prominent with the findings suggesting a complex mass having both cystic and solid components. The mass measures about 3 cm in diameter and is nonspecific consistent with either a dilated tube, abscess or even tumor. The right adnexa is well visualized and is normal.
The uterus was lightly dilated although it was normal in contour. A small sonolucency was persistently seen within the uterus. It was poorly visualized although it overall appearance suggests an early gestational sac. The uterus is otherwise normal.
IMPRESSION:
Left adnexal density as described. Possible early intra-uterine gestational sac. A follow-up study in one t two weeks time is recommended for further evaluation.
Based on the examination, the sonogram, the history, the HCG as well as the other blood tests, defendant modified his working diagnosis to include: uterine pregnancy, urinary tract infection, ovarian cyst on the left side and ectopic pregnancy. The ectopic pregnancy was not ranked high on the list.
A second sonogram was performed at the hospital on June 14. The only change visualized was that the left adnexa was less prominent. Defendant explained to plaintiff the adverse effects the antibiotics administered could have on the fetus. Included was the risk that the fetus would be aborted. Because defendant did not perform abortions, he gave plaintiff the *417 name of the Red Bank Surgicenter in the event she decided to have an abortion.
Defendant testified that he did not perform a laparoscopy because that would have been tantamount to an abortion and the procedure would have involved great risks to the plaintiff. This procedure is performed under general anesthesia. Its purpose would have been to enable defendant to visualize the ovaries, fallopian tubes and to see if fluid had accumulated behind the uterus. The final diagnosis at the hospital was probable uterine gestation (pregnancy) and urinary tract infection. When plaintiff was discharged from the hospital on June 15, an appointment was made for her to see defendant on June 20. Plaintiff, however, failed to keep the appointment.
On June 16, 1983, plaintiff went to the Red Bank Surgicenter where Dr. Smith performed an abortion. After completing the abortion procedure, Dr. Smith informed plaintiff there was no fetus to abort. Plaintiff next saw defendant on June 24, 1983. She informed him what happened at the Surgicenter. Defendant sent plaintiff back to the hospital for a third sonogram that was performed on June 28. This sonogram was interpreted as revealing an "enlarged uterus extending to the right. The echo free area which may have represented gestational sac on the prior study is not seen on this examination. The adnexal mass on the left is again seen and unchanged. No other features are seen."
Significantly, the last sonogram disclosed that the gestational sac had disappeared since the June 14 sonogram. Both the June 10 and 14 sonograms reported that the right adnexa was normal  meaning both the fallopian tube and the ovary were normal.
Plaintiff was hospitalized again by defendant on July 1 because of severe abdominal pain. The admitting diagnosis was an adnexal mass. Although this mass had been visualized in each of the three sonograms, it had not changed between June 10 and June 28. Dr. McCartin performed an exploratory *418 laparotomy on July 2 at the hospital. This involved the opening of the abdominal cavity. A ruptured right tubal pregnancy was visualized. Old clotted blood was observed, but there was no evidence of recent bleeding. The left ovary, tube and uterus appeared normal. The right fallopian tube was not particularly enlarged and appeared intact to the naked eye. This time, as before, no fetus was found.
Plaintiff presented the testimony of Lawrence Miller, D.O., to establish the required standard of care and the alleged deviation from that standard. Plaintiff undertook to establish Dr. Miller's qualifications to render an expert opinion before his opinion was rendered. Dr. Miller obtained a degree in osteopathic medicine in 1957 followed by a one year rotating internship and then a one year general residency. Two weeks during the residency, he studied obstetrics and gynecology. He did a three year residency in orthopedics from 1959 to 1962. He was licensed to practice in New Jersey in 1962. Between 1976 and 1978 he did a residency in psychiatry.
Dr. Miller admitted during cross-examination that he has never practiced obstetrics and gynecology; nor has he performed surgery to terminate an ectopic pregnancy. He has never seen anyone perform such surgery. He even admitted that he has never cared for a pregnant patient. He read no books, articles or pertinent literature to assist in formulating his opinion in this case.

II
Plaintiff contends for the first time on appeal that because counsel for defendant did not cross-examine Dr. Miller respecting qualifications before his opinions were stated before the jury, defendant waived the right to object. Plaintiff further argues that because the judge allowed Dr. Miller to testify before the jury and because the judge informed the jury regarding the meaning and purpose of expert testimony, the judge found Dr. Miller was qualified.
*419 The record discloses that after counsel for plaintiff completed the direct examination on Dr. Miller's qualifications, the trial judge asked defense counsel if he wished to cross-examine on qualifications. The following colloquy occurred in response:
MR. GROSSMAN [attorney for defendant]: With the court's permission, I'd like to reserve any questions I have until cross examination.
THE COURT: All right. So basically at this particular time you are not objecting to allowing him to testify as a medical expert in this case?
MR. GROSSMAN: Not at this particular time.
THE COURT: Thank you. All right. Based on the fact that you are dealing with a licensed physician I will allow him to testify as an expert in this case.
Now, by the Court allowing him to testify as an expert witness in this case it doesn't mean that you have to accept the opinions that the doctor offers. He is being called to assist you in determining an issue or a fact in issue in this particular case.
The testimony of the doctor does not supplant your judgment. You have to evaluate his credibility as you would any other witness in a case. So the fact that I am allowing him to testify doesn't mean the Court is vouching for the opinions that he offers....
At the end of plaintiff's evidence, Mr. Grossman stated: "Your Honor, with regard to making a motion at the end of plaintiff's case, I wish to reserve on that until later, if I may." The court responded: "Okay. Go ahead." It was not until the close of all of the evidence that defense counsel made a motion for relief based on Dr. Miller's lack of qualifications.
Our careful study of the record satisfies us that neither defense counsel nor the trial judge accepted Dr. Miller as a qualified expert. Defense counsel elected to wait until cross-examination to attack Dr. Miller's lack of qualifications because he needed to refer to his testimony in this case while pointing out how little he knows about what he claims was a deviation. The trial judge simply permitted the trial to move forward conditionally. The last sentence of Evid.R. 19 permits the judge to "receive the testimony of the witness conditionally" subject to being satisfied later that the witness was qualified. That procedure was followed here without objection. We are completely satisfied this was an appropriate case for the procedure employed in light of the fact that plaintiff called only one expert witness. Further, Dr. Miller was expected to give *420 opinion evidence as opposed to factual evidence. It was proper therefore for the judge to inform the jury what to expect.

III
Plaintiff argues further that Dr. Miller was qualified to render an expert opinion in this case and that the judgment n.o.v. should not have been granted. The standard for granting a judgment n.o.v. was articulated in Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969). The same standard controls motions made during trials pursuant to R. 4:40-1 before a verdict has been rendered and those made pursuant to R. 4:40-2(b) after the verdict. Here, that standard requires us to determine whether the judge was correct in concluding that Dr. Miller was not qualified within the contemplation of Evid.R. 19.
Through the expert, plaintiff was required to establish that defendant failed to exercise "the degree of care, knowledge and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in his field." Germann v. Matriss, 55 N.J. 193, 208, 260 A.2d 825 (1970); Schueler v. Strelinger, 43 N.J. 330, 344, 204 A.2d 577 (1964); Sanzari v. Rosenfeld, 34 N.J. 128, 134-135, 167 A.2d 625 (1961). See also Largey v. Rothman, 110 N.J. 204, 215, 540 A.2d 504 (1988); Rosenberg by Rosenberg v. Cahill, 99 N.J. 318, 325, 492 A.2d 371 (1985); Klimko v. Rose, 84 N.J. 496, 503-505, 422 A.2d 418 (1980); Fernandez v. Baruch, et al., 52 N.J. 127, 131, 244 A.2d 109 (1968). In an endeavor to comply with the foregoing standard, plaintiff presented the testimony of Dr. Miller respecting both the standard of care owed and the alleged deviation therefrom.
Dr. Miller testified that on June 15, 1983, defendant deviated because he should have known there was an ectopic pregnancy and he should have performed a laparoscopy or a laparotomy. Dr. Miller testified that he has never performed either procedure and that he does not know how to perform either procedure. He admitted not knowing the risks associated with either *421 procedure. He also stated that the need for either procedure on June 15 was his personal opinion.
When defense counsel made the motion for an involuntary dismissal at the close of all the evidence, he argued that Dr. Miller lacked the minimal qualifications to render an opinion and that his opinion represented his personal point of view rather than the standard for a gynecologist and obstetrician. The trial judge reserved decision on the motion because the case had already been tried. The judge at that time, however, expressed the opinion that he thought Dr. Miller was unqualified. The decision respecting Dr. Miller's lack of qualifications was not rendered until the motion for judgment n.o.v. was decided.
Evid.R. 19 establishes the test for determining whether a witness is qualified to render an expert opinion. That rule provides that "[a]s a prerequisite for the testimony of a witness there must be evidence that he has personal knowledge of the matter, or experience, training, or education, ...." Where the expert's personal qualifications are challenged, the "mere possession of a license to practice medicine does not without more conclusively establish the physician's [qualifications] to testify in a malpractice case." Carbone v. Warburton, 11 N.J. 418, 424-425, 94 A.2d 680 (1953). In addition to holding a license to practice medicine, Dr. Miller was required to demonstrate that he was "versed in the subject [of obstetrics and gynecology] from actual experience in his own practice or from observations of treatments by other practitioners or from reading and study." Id. at 426, 94 A.2d 680. See also Bellardini v. Krikorian, 222 N.J. Super. 457, 463, 537 A.2d 700 (App.Div. 1988).
The trial judge found Dr. Miller was unqualified under Rule 19 because he did not know what standard of care was required and that
Dr. Miller has never practiced one hour as an obstetrician or gynecologist. He did not testify to any specialized training in obstetrics. He has never performed a laparoscopy.

*422 He was unfamiliar with the procedure for performing a laparoscopy; he didn't know how to perform it. He did not know the risks involved with a laparoscopy. He did not testify to doing any reading, special reading, or study concerning either obstetrics or the procedure known as laparoscopy.
When asked questions on cross examination concerning terminology and anatomy dealing with the medical conditions at issue in the case, Dr. Miller was virtually ignorant on the subject.
* * * * * * * *
Regarding his position that if the operation had been done sooner, Dr. Miller concluded that it had to have been more difficult than if it had been performed a week or two earlier because the fetus was growing in the fallopian tube and there had been quote "debris all over the place" close quote when defendant operated on July 2, 1983.
* * * * * * * *
On cross examination, Dr. Miller offered no medical facts on which he came to a conclusion that the operation of July 2, 1983 was made more difficult because of the passage of time. Dr. Miller further admitted that he never in his career was in charge of taking care of a pregnant patient and making the decisions that a doctor would make concerning her care and treatment.
We find substantial evidence in the record to support the trial judge's determination that Dr. Miller was not qualified under Evid.R. 19 to render an expert opinion pursuant to Evid.R. 56(2). The trial judge's finding of lack of qualification should not be vacated absent a showing that the decision was clearly erroneous. Carbone v. Warburton, 11 N.J. at 424, 94 A.2d 680; Hudgins v. Serrano, 186 N.J. Super. 465, 475, 453 A.2d 218 (App.Div. 1982). Our careful study of the record satisfies us that the decision was not clearly erroneous. Therefore, we find no abuse of discretion.
We are also persuaded that Dr. Miller gave a net opinion when he testified that a laparotomy or a laparoscopy should have been performed on or about June 15. "The expert testimony must relate to generally accepted medical standards, not merely to standards personal to the witness." Fernandez v. Baruch, 52 N.J. at 131, 244 A.2d 109; Carbone v. Warburton, 11 N.J. at 425, 94 A.2d 680. Dr. Miller only had a personal opinion. Since he did not know what the standard was for defendant's specialty, he was in no position to express more than his personal opinion. A standard that is personal to the *423 witness is equivalent to net opinion. Fernandez v. Baruch, supra; Carbone, supra; Parker v. Goldstein, 78 N.J. Super. 472, 189 A.2d 441 (App.Div.), certif. den. 40 N.J. 225, 191 A.2d 63 (1963). Such an opinion provides no assistance to the trier of fact as contemplated by Evid.R. 56(2).

IV
Plaintiff's contention that expert testimony was not required because this is a common knowledge case is clearly without merit. Generally, in a medical malpractice case, an expert is required to establish the standard of care and deviation. Rosenberg by Rosenberg v. Cahill, 99 N.J. 318, 325, 492 A.2d 371 (1985); Sanzari v. Rosenfeld, 34 N.J. at 135, 167 A.2d 625. But an expert is not required where the matter falls within the common knowledge doctrine. See Buckelew v. Grossbard, 87 N.J. 512, 529, 435 A.2d 1150 (1981); Steinke v. Bell, 32 N.J. Super. 67, 70, 107 A.2d 825 (App.Div. 1954).
Here, it would be impossible for lay people to know whether either a laparoscopy or a laparotomy should have been performed on June 15. At that time, two sonograms showed a normal right fallopian tube. Moreover, the gestational sac visualized on the sonogram two days before the abortion procedure was performed was not visualized on the sonogram performed after the abortion procedure. Under the evidence presented, it was not readily apparent to anyone of average intelligence and ordinary experience that defendant should have performed a laparoscopy or a laparotomy on June 15. This becomes even more apparent when the serious risks associated with both invasive procedures are considered.
Similarly, it cannot be said that it was within the jury's common knowledge that defendant should have provided a different course of medical care without saying what he should have done. Defendant obtained a series of diagnostic tests to assist with determining the probable diagnosis and then proceeded with a treatment plan. It is not a matter of common *424 knowledge what, if anything, he should have done further on June 15. See Hake v. Manchester Twp., 98 N.J. 302, 313, 486 A.2d 836 (1985); Klimko v. Rose, 84 N.J. 496, 505, 422 A.2d 418 (1980).
The judgment n.o.v. is affirmed.
LANDAU, J.A.D., concurring.
I concur in the result because the record clearly supports the determination that Dr. Miller was not qualified to testify respecting standards of care in this area of specialization either by training, experience, or study in learned publications, and his testimony reflected a lack of specialized knowledge.
Notwithstanding Justice Brennan's frequently referenced language in Carbone v. Warburton, 11 N.J. 418, 425-426, 94 A.2d 680 (1953) that a physician's "license to practice at least imports some general competency to testify on all medical subjects," that opinion also emphasized that a general practitioner who seeks to be qualified to render an expert opinion in an area of specialization must be "shown to be versed in the subject from actual experience ... or from observations of treatments by other practitioners, or from reading and study." However, Carbone also set down as the usual practice that qualifications of the expert be challenged at the outset or for the trial judge to require that they be developed by testimony, with privilege of cross-examination by the opposite party. The Carbone opinion recognized, too, that while possession of a medical license does not alone conclusively establish competency to testify in a malpractice case, "[i]t may be that if the witness is permitted to state his opinion without the party against whom it is offered first demanding additional evidence of his qualifications ... the party will not be heard later to complain of his competency to give the opinion." Id. 11 N.J. at 425, 94 A.2d 680.
Here, the defendant elected to defer examination of Dr. Miller's qualifications to testify as an expert on the specialized *425 issues here involved until cross-examination. Possibly this was allowed by the trial judge under Evid.R. 19 which permits receiving testimony of a witness conditionally, subject to evidence of knowledge, experience, training or education being later supplied in the course of trial. Defendant here made clear that he was not waiving the right to challenge Dr. Miller's qualifications.
Nonetheless, that challenge only came after all parties had rested, in the form of what was essentially (although mischaracterized at trial) a R. 4:40-1 motion for judgment. The trial judge declined to grant the motion, but invited renewal under R. 4:40-2(b). Thus there was never, during the trial, an adverse ruling as to Dr. Miller's qualifications, and the case went to the jury with the standard admonitions about expert testimony, but with the jury presumably believing that Dr. Miller was deemed qualified to render an expert opinion. I do not believe that this procedure should be encouraged.
Evid.R. 19 permits the judge to receive testimony conditionally only "in exceptional circumstances." Nothing exceptional was raised by counsel, nor recognized by the court in this case. Nor does the record reflect any basis for now recognizing any exceptional circumstances. I respectfully suggest that the "usual practice" referenced in Carbone, i.e., an initial exploration and judicial determination of the adequacy of an expert's qualifications (particularly where, as here, they are not self-evident) would be the better practice for us to encourage.
This would diminish substantially the possibility of prejudice to either party from an adverse ruling on qualifications after the jury has heard the challenged expert testify.