246 N.J. Super. 554 (1991)
588 A.2d 412
MARY JAMES, INDIVIDUALLY AND AS ADMINISTRATRIX TO THE ESTATE OF SELWYN JAMES, DECEASED AND AS ADMINISTRATRIX AD PROSEQUENDAM FOR SELWYN JAMES, DECEASED, PLAINTIFF-APPELLANT,
v.
CITY OF EAST ORANGE, EAST ORANGE GENERAL HOSPITAL, DR. NANCY CAHIWAT, DR. L. PRYSTOWSKY, MARY HUSPEN, R.N., AND DR. LARRY PETTIS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 20, 1991.
Decided March 18, 1991.
*556 Before Judges ANTELL, O'BRIEN and KEEFE.
Eldridge Hawkins argued the cause for appellant.
William S. Mezzomo argued the cause for respondent Dr. Larry Pettis (McDonough, Korn & Eichhorn, attorneys; Peter L. Korn, of counsel; William S. Mezzomo, on the brief).
Peter A. Greene argued the cause for respondents East Orange General Hospital, Dr. L. Prystowsky and Mary Huspen, R.N. (Feuerstein, Sachs, Maitlin & Fleming, attorneys; Peter A. Greene, on the brief).
The opinion of the court was delivered by ANTELL, P.J.A.D.
At 1:30 a.m., April 27, 1984, plaintiff's husband, decedent Selwyn James, appeared at East Orange Police Headquarters and reported that he had just killed his wife. In fact, although he had injured plaintiff during a domestic argument, she was alive and was then receiving emergency care at the East Orange General Hospital. The police detained decedent for a number of hours, and after it became apparent he was ill they transported him to the East Orange General Hospital emergency room. This was around 9:40 a.m. He was diagnosed as suffering from alcoholic gastritis and treated accordingly. Actually, decedent had swallowed a large number of aspirin tablets with wine before reporting to East Orange Police Headquarters earlier that morning. He died at approximately 5:45 that afternoon, and the cause of death was determined to be acute salicylate intoxication (aspirin poisoning). Toxicological studies revealed no alcohol in the blood.
*557 This medical malpractice suit arising from decedent's death was begun against the hospital, the defendant doctors Cahiwat, Prystowsky and Pettis, and defendant nurse Huspen. The claim against Dr. Cahiwat was dismissed prior to trial on summary judgment. That determination is not presented for review. The plaintiff also sued the City of East Orange on various claims of misconduct which contributed to decedent's death, and that action has been settled. Based upon the lack of expert testimony establishing defendants' departure from accepted standards of medical care, the trial court dismissed the malpractice suit at the close of plaintiff's case. Plaintiff appeals from that determination.
The reason for the omission in plaintiff's proofs was that the trial court refused to recognize the qualifications of plaintiff's proffered medical witness, Dr. William Ober. Dr. Ober's specialization for many years has been laboratory pathology. The reason the court decided to bar his testimony was its belief that Dr. Ober was not sufficiently familiar with the practice of emergency room medicine. The rejection seems to have been generated by the doctor's refusal on cross-examination to characterize his qualifications by using the word "expert" on the subject of emergency room medicine. Instead, he preferred to say, "I know a good deal about [emergency room standards]." To the question asked on cross-examination as to whether there were "some standards you know about and some you don't," he answered "Yes, that's a reasonable way of putting it." There then followed the following exchange of questions and answers:
Q. Doctor, how are we to know what standards of practice in emergency room care you do know about and those you don't know about?
A. If you let Mr. Hawkins [plaintiff's attorney] proceed with his examination you'll find out.
Q. In other words, we'll trust you to tell us which standards you know and which standards you don't?
A. I've been known very frequently to say I don't know.
N.J.R.Evid. 19 is applicable. It provides:
As a prerequisite for the testimony of a witness there must be evidence that he has personal knowledge of the matter, or experience, training, or education, *558 if such be required. Such evidence may be provided by the testimony of the witness himself. The judge may reject the testimony of a witness that he perceived a matter if he finds that no trier of fact could reasonably believe that the witness did perceive the matter. In exceptional circumstances, the judge may receive the testimony of the witness conditionally, subject to the evidence of knowledge, experience, training or education being later supplied in the course of the trial.
Also relevant is N.J.R.Evid. 56(2):
A witness qualified pursuant to Rule 19 as an expert by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue. The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
While it is true that "mere possession of a license to practice medicine does not without more conclusively establish the physician's competency to testify in a malpractice case ... [h]is license to practice at least imports some general competency to testify on all medical subjects." Carbone v. Warburton, 11 N.J. 418, 424-25, 94 A.2d 680 (1953). Moreover, a general practitioner may state an opinion concerning the acts or omissions of a specialist.
It is enough that though a general practitioner he is shown to be versed in the subject from actual experience in his own practice or from observations of treatments by other practitioners or from reading and study. The fact that he is not a specialist may disparage his qualifications and thereby the weight to be given his opinion, but it does not render him incompetent to state an opinion. [emphasis supplied]
Id.
In Sanzari v. Rosenfeld, 34 N.J. 128, 136, 167 A.2d 625 (1961), the Supreme Court reiterated that "the license to practice imports the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion." The fact that physicians are competent to testify as to matters lying outside their field of specialization has also been recognized in other cases. See Lewis v. Read, 80 N.J. Super. 148, 193 A.2d 255 (App.Div.), certif. granted, 41 N.J. 121, 195 A.2d 17 *559 (1963) (neurologist held competent to testify as to matters within the specialty of obstetrics); Rosenberg by Rosenberg v. Cahill, 99 N.J. 318, 492 A.2d 371 (1985) (medical physician held competent to express an opinion as to the standard of care applicable to chiropractor); Sanzari v. Rosenfeld, supra (physician held competent to testify in malpractice action against dentist).
In addition to what is implied by a license to practice, the necessary qualification to testify as an expert may be supplied on the basis of "knowledge or experience acquired over a period of years." Bellardini v. Krikorian, 222 N.J. Super. 457, 463, 537 A.2d 700 (App.Div. 1988). See also Correa v. Maggiore, 196 N.J. Super. 273, 282, 482 A.2d 192 (App.Div. 1984). As it is said, a witness may be qualified to testify as an expert either "`by study without practice or by practice without study.'" State v. Chatman, 156 N.J. Super. 35, 41, 383 A.2d 440 (App.Div.), certif. denied, 79 N.J. 467, 401 A.2d 224 (1978) (quoting State v. Smith, 21 N.J. 326, 334, 121 A.2d 729 (1956)).
Dr. Ober received his medical degree in 1946. Following some years of residencies and practice as a pathologist, he became Director of Laboratories at Knickerbocker Hospital in Manhattan. He held that position from 1957 to 1970, and during this period he spent approximately four afternoons a week working in the emergency room. Most often this happened when the attending physicians went to their private offices and he was, in his words, the "only qualified physician in the place so many times I was called to the emergency room down there to do all sorts of things."
In 1983 Dr. Ober became the Assistant Medical Examiner in Bergen County and continued to hold that position at the time of the trial in November 1989. At the Hackensack Medical Center the emergency room is situated just on the other side of the corridor from the laboratory where he works. Although he has had no direct responsibility for patient care since 1970, he maintains his interest in emergency room medicine. He testified *560 that at Hackensack Medical the emergency room was under the supervision of his close friend and associate, Nelson Walker, and he made it a point to visit Dr. Walker "and see the patients very, very frequently. I would examine patients there." He would also "participate in the discussions at their bedside." Relating to his experience with emergency room medicine, he said "I know a good deal about it. I've been there. I've seen it. I've done it. * * * I have a great deal of experience of knowing what should be done and what should not be done." As he stated, he acquired his knowledge of emergency room standards by discussing them with other doctors, by attending conferences and meetings and keeping up with the literature.
Dr. Ober testified that the field of emergency room medicine began to develop as a specialty as recently as 1975. The court itself acknowledged, "It's a very new specialty." Although Dr. Ober himself is not board certified as an emergency room physician, he is familiar with the guidelines set out by the College of Emergency Physicians, College of Emergency Medicine. He has also previously testified as an expert medical witness in cases involving hospital emergency room care about half a dozen times, most recently approximately three years before the date of this trial.
While emergency room medicine may have received formal recognition as a medical specialty, the emergency room standards applicable to this case about which Dr. Ober was prepared to testify do not, it appears to us, fall far outside the area occupied by the general practice of medicine. The import of his report furnished prior to trial seems to say little more than that, whether in an emergency room or anywhere else, defendants failed to practice good medicine. Among the acts and omissions which Dr. Ober characterized as falling below accepted standards of care, for example, is the failure of Dr. Prystowsky to have been more aggressive in inserting a naso-gastric tube for gastric lavage, Dr. Ober pointing out that although the patient was uncooperative he could have been sedated with *561 intravenous valium or a similar drug. He also cites Dr. Prystowsky's failure to recognize that the decedent's state of excitement was due to the action of salicylate on the central nervous system, noting that this phenomenon is not seen in simple alcoholic gastritis.
As to Dr. Pettis, Dr. Ober writes that he made the diagnosis of alcoholic gastritis without detecting any odor of alcohol on the patient's breath or vomitus and without ordering a blood alcohol test. Dr. Pettis also missed the significance of the decedent's tachycardia and tachypnea. Dr. Ober also observes that although an electrocardiogram was ordered, none was taken. Nurse Huspen is faulted for not taking a complete and accurate history.
Nowhere does the record show that these shortcomings in practice implicate any standards unique to emergency room medicine. Furthermore, the "emergency" aspect of this occurrence is considerably diminished by the facts that decedent was in the hospital for a period of eight hours before he expired and that four hours before his death he had been transferred out of the emergency room to the medical floor.
No significance attaches to Dr. Ober's acknowledgement that there are some emergency room standards that he does not know about or to his unwillingness to use the term "expert" in characterizing his state of knowledge. We are not concerned here with "all" emergency room standards.
The test of whether a particular witness is competent to testify as an expert in a malpractice action is whether he has sufficient knowledge of professional standards applicable to the situation under investigation to justify his expression of an opinion relative thereto. Carbone v. Warburton, supra, 11 N.J. at p. 425, 94 A.2d 680.
Sanzari v. Rosenfeld, 34 N.J. at 136, 167 A.2d 625 (emphasis added).
We distinguish this case from our recent decision in Crespo v. McCartin, 244 N.J. Super. 413, 582 A.2d 1011 (App.Div. 1990). In that medical malpractice action the trial court set aside a judgment in favor of plaintiff on the ground that her expert *562 witness was determined to have been unqualified to testify to a deviation from accepted standards by defendant, an obstetrician, and this court affirmed. The cause of action alleged was based on a claim of misdiagnosis or failure to diagnose and treat an ectopic pregnancy. Plaintiff's expert witness was an osteopath specializing in orthopedics. The deviation to which he testified was defendant's failure to recognize the ectopic pregnancy and his failure to perform a laparoscopy or a laparotomy. The witness had never practiced obstetrics or gynecology, nor performed surgery to terminate an ectopic pregnancy. Furthermore,
He has never seen anyone perform such surgery. He even admitted that he has never cared for a pregnant patient. He read no books, articles or pertinent literature to assist in formulating his opinion in this case.
....
Doctor Miller [the expert witness] testified that he has never performed either procedure [laparoscopy or laparotomy] and that he does not know how to perform either procedure. He admitted not knowing the risks associated with either procedure. He also stated that the need for either procedure on June 15 was his personal opinion.
Id. at 418-21, 582 A.2d 1011.
Simply put, Crespo was unusual in that there was an utter absence of any degree of qualification for the witness to state his opinion with respect to the question at issue. It was affirmatively shown that despite his licensure the witness knew nothing whatever about the highly specialized subject matter of his testimony. Also, in Crespo the question of the witness's qualification was dealt with after he had testified to his opinion and the court was able to determine whether the witness was in fact qualified to provide the disputed testimony. Here, the witness was barred before the court could learn what his testimony would be. The material distinctions between this case and Crespo are evident to us.
We conclude that the trial court's decision to exclude Dr. Ober's testimony was "clearly erroneous." Sanzari v. Rosenfeld, 34 N.J. at 136, 167 A.2d 625. Dr. Ober's competency to *563 testify as an expert medical witness had been demonstrated. Any deficiencies in his qualifications should have been left to the consideration of a jury "to determine the credibility, weight and probative value of the expert's testimony." Rubanick v. Witco Chemical Corp., 242 N.J. Super. 36, 48, 576 A.2d 4 (App.Div. 1990).
Plaintiff argues that the trial court erred in refusing to allow plaintiff to read into evidence the deposition of one of the defendants' expert witnesses as part of plaintiff's case. The witness had not given permission for his deposition to be used as part of plaintiff's case and the trial court therefore ruled correctly. Genovese v. New Jersey Transit Rail Operations, Inc., 234 N.J. Super. 375, 380-81, 560 A.2d 1272 (App.Div. 1989), certif. denied, 118 N.J. 195, 570 A.2d 960 (1989).
Plaintiff also complains that the trial court erred in denying her a right to prove "a constitutional claim of right to life and pursuit of happiness" and by excluding evidence that defendant Dr. Pettis received treatment for alcoholism and drug abuse in 1987. Both contentions are clearly without merit. R. 2:11-3(e)(1)(E).
Plaintiff's brief and oral argument are committed in large measure to documenting the grievance that the presentation of her case was significantly prejudiced by the trial judge's castigation and belittling treatment of plaintiff's attorney in the jury's presence. Notwithstanding that we are remanding the matter for a new trial on other grounds, because of the perception shared by plaintiff and her attorney that the trial judge was acting out of personal bias, we have carefully examined the alleged instances of intemperate conduct in the trial transcript. Since it is unnecessary to the disposition of this appeal to reach a judgment as to whether the judge exhibited bias, and since no useful purpose will be served by spreading on the record the actual exchanges between the judge and counsel, we choose not to do either. It is enough to say that the judge's rebukes and aspersions were out of proportion to counsel's transgressions. *564 "A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity...." Code of Judicial Conduct Canon 3A(3). Plaintiff's dismay with the censorious language addressed to her attorney by the judge is not to be lightly dismissed. To guard against any further appearance of unfairness we direct that the retrial of this matter be presided over by a judge other than the one who presided below.
Reversed and remanded for a new trial in conformity with this opinion.