277 N.J. Super. 88 (1994)
649 A.2d 76
RUBY CROMARTIE AND ANTHONY CROMARTIE, PLAINTIFFS-RESPONDENTS,
v.
CARTERET SAVINGS & LOAN, DEFENDANT-APPELLANT, AND ALLSTATE INSURANCE COMPANY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Submitted September 12, 1994.
Decided November 4, 1994.
*90 Before Judges PETRELLA, HAVEY and BROCHIN.
*91 Mendes & Mount, attorneys for appellant Carteret Savings & Loan (William S. Wachenfeld, of counsel; Shari R. Jacobs, on the briefs).
Oscar J. Miller, attorney for respondent Ruby Cromartie.
Cyril S. Hodge, attorney for respondent Anthony Cromartie.
No other parties participated in this appeal.
The opinion of the court was delivered by BROCHIN, J.A.D.
The subject of this appeal is a mortgagee's liability for failing to pay premiums for hazard insurance on the mortgaged property with funds paid by the mortgagor and escrowed for that purpose.
In 1970, plaintiffs Ruby and Anthony Cromartie purchased a house in Newark, New Jersey for $26,750. To finance their purchase, they borrowed $25,000 from J.I. Kislak Mortgage Corporation, securing their loan by an F.H.A. insured first mortgage on the property. Their mortgagee assigned the mortgage to defendant Carteret Savings and Loan Association. Carteret, although continuing to service the mortgage, thereafter assigned it to Federal Home Loan Bank of New York.
As required by the mortgage, the Cromarties also purchased fire insurance from Allstate Insurance Company. They did not introduce their insurance policy into evidence. However, Carteret introduced an Allstate "Deluxe Homeowners Policy" for a one-year period beginning July 7, 1977, which insured the Cromarties and their mortgagee against various risks, including fire damage to the extent of $32,000 for the dwelling, $3,200 for appurtenant private structures, and $16,000 for unscheduled personal property. This 1977 insurance policy was one of the annual renewal policies which replaced their original policy.
The terms of the Cromarties' mortgage required them to make a single monthly payment to the mortgagee each month in an amount which would include a pro rata portion of the annual real *92 estate taxes, assessments and premiums for "policies of fire and other hazard insurance covering the mortgaged property." The mortgage also provided that these payments would be "held by Mortgagee in trust to pay said ... premiums, taxes and special assessments; and ... [would] be applied by the mortgagee to the following items in the order set forth: ... taxes, special assessments, fire, and other hazard insurance premiums."
The Cromarties made the monthly payments due under the mortgage. From 1970 to some time in 1978, the mortgagees paid the taxes on the property to the City of Newark and the hazard insurance premiums to Allstate Insurance Company out of the escrowed funds which they collected from the Cromarties. During that period Carteret, first on its own behalf and then as servicing agent for Federal Home Loan Bank of New York, obtained annual renewal policies from the insurer without any action on the part of plaintiffs. These renewal policies were received and retained by Carteret. However, beginning some time in 1978, although Carteret continued to collect the monthly sums to pay the insurance premiums, it stopped paying them to Allstate Insurance Company. Consequently, the fire insurance on plaintiffs' property lapsed. Carteret did not report the termination of coverage to plaintiffs and, in fact, continued to send them periodic statements of their escrow account. These statements reflected the amounts which Carteret collected from plaintiffs to pay premiums. Since the statements did not show an accumulation of undisbursed funds in the escrow account, they implied that Carteret was continuing to pay premiums to maintain hazard insurance on the property.
On November 10, 1983, plaintiffs' house was so severely damaged by fire that it became uninhabitable. Mrs. Cromartie reported the fire to Allstate Insurance Company and then to Carteret. Allstate responded by informing her, for the first time, that her fire insurance policy had lapsed. Veronica Errico, who was then the manager in charge of Carteret's insurance department, told Mrs. Cromartie that Allstate was at fault for terminating the *93 policy and that Carteret would take care of the property until the insurance coverage issue had been resolved.
Carteret commenced a suit against Allstate for the fire damage, but the suit was dismissed on the ground that it was barred by the one-year period of limitations which is a standard provision of a New Jersey fire insurance policy. See N.J.S.A. 17:36-5.20; but cf. Peloso v. Hartford Fire Ins. Co., 56 N.J. 514, 521, 267 A.2d 498 (1970) (period within which insured may sue on a fire insurance policy is tolled from the time the insured gives notice to sue until liability is formally declined). Apparently acting in the caretaking role which it assumed after the fire, Carteret purchased insurance to protect the property against further damage by fire and charged the premiums to the Cromarties' escrow funds, had the house boarded up to prevent a continuation of reported vandalism, and arranged for monthly inspections. These inspections continued until 1985 or 1986.
Thereafter, the City of Newark acquired the property by foreclosure. Plaintiffs assert that the foreclosure occurred in September 1986, and they claim to have received no notice of it. We cannot tell from the record submitted to us whether the foreclosure was for unpaid real estate taxes, for sewerage charges, for water usage fees, or for some combination of all three. Carteret was responsible for the payment of taxes at least to the extent of the escrowed funds which it had collected from the Cromarties for that purpose. However, the mortgage does not provide for Carteret to pay sewerage and water charges. There is nothing in the record to show that the caretaking function which Carteret assumed after the fire extended to paying those charges. Carteret did not continue paying taxes and the Cromarties made no further mortgage payments after the fire.
After Newark had foreclosed its liens on the property, the Cromarties commenced this suit against Carteret Savings and Loan and Allstate Insurance Company. They alleged that Allstate had failed to notify them of the lapse of their policy and that it was therefore liable to them for breach of contract and for *94 negligence. They also alleged that because Carteret had allowed their fire insurance to lapse, it was liable to them for breach of contract, fraud, and negligence. Carteret counterclaimed for the unpaid balance of the mortgage loan.
The claims against Allstate were dismissed. The court held that they were barred because suit had not been instituted within the period of limitations established by N.J.S.A. 17:36-5.20. The remaining claims were tried to a jury. At the close of the presentation of the evidence, the trial judge dismissed plaintiffs' negligence claim on the ground that it was subsumed in their contract claim. He held that the evidence presented at trial had proved, beyond any reasonable dispute, that Carteret had contracted to maintain insurance coverage on the Cromarties' property or to notify them of its termination, and that it had breached that obligation. He therefore withheld the issue of Carteret's contractual liability from the jury and decided as a matter of law that Carteret had breached its contract with the plaintiffs.
The parties stipulated the amount of the unpaid principal balance of the Cromarties' mortgage loan. Carteret was insured by Lloyds of London under a mortgage impairment policy and, because it lost its security as the result of the fire, it received insurance proceeds under that policy for the unpaid balance of the mortgage loan. The trial judge ruled that whether Carteret's receipt of the insurance proceeds from Lloyds precluded it from collecting the balance of the mortgage loan from the Cromarties was a matter of law[1]. He therefore withheld from the jury any issue relating to the counterclaim. The only issues which he submitted to the jury were plaintiffs' fraud claims and the amount, if any, of plaintiffs' damages resulting from Carteret's breach of contract which were within the reasonable contemplation of the parties at the time they made the contract.
*95 The jurors found by their verdict that Carteret had committed equitable fraud. A majority of jurors found that Carteret had not committed legal fraud, but the court declared a mistrial with respect to the finding of no legal fraud because the requisite number of jurors had not concurred. The jury also found that the damages which would reasonably and fairly compensate the plaintiffs for their losses were $77,000 for property damage and $145,000 for loss of rent. Following the conclusion of the trial, the court held that Carteret was not entitled to a judgment on its counterclaim for the unpaid balance of its mortgage because it had already been compensated under its insurance policy and a judgment against the Cromarties would therefore amount to a double recovery. A judgment was therefore entered in favor of the Cromarties in accordance with the jury's verdict for $222,000 principal plus $86,210 prejudgment interest.
On appeal, Carteret argues that the trial judge committed error by ruling as a matter of law that it had breached the terms of its mortgage contract by failing to maintain a fire insurance policy in effect or to notify the Cromarties of the lapse of their insurance. Carteret also contends that it was entitled to a judgment notwithstanding the verdict because, even if an Allstate policy had remained in force to insure the Cromarties against fire loss, the policy would have been void because, contrary to its terms, they were living elsewhere and renting the property to others at the time of the fire. Carteret argues further that the judgment should be reversed because the Cromarties were permitted to examine its former employee, Veronica Errico, about her knowledge of and the extent of its compliance with HUD regulations pertaining to FHA mortgages and because the jury was told that those regulations imposed a duty on Carteret toward the Cromarties. Additionally, Carteret asserts that the jury should not have been permitted to assess damages based on the value of their property in 1988 because the fire damage was sustained in 1983, and Carteret maintains that the jury should not have been permitted to assess damages based on lost profits because the Cromarties did not offer evidence of their expenses. Lastly, Carteret *96 disputes the court's ruling that it was not entitled to repayment of the unpaid balance of its mortgage loan.
We agree with the trial judge that Carteret breached its contractual obligation when it permitted the fire insurance on the Cromarties' property to lapse without notifying them. The terms of the mortgage required the Cromarties to make a single monthly payment to their mortgagee each month in an amount which would include a pro rata portion of annual real estate taxes, assessments and premiums payable for "policies of fire and other hazard insurance covering the mortgaged property." The mortgagor's payments were to be "held by Mortgagee in trust to pay said ... premiums, taxes and special assessments; ... and [shall] be applied by the mortgagee to the following items in the order set forth: ... taxes, special assessments, fire, and other hazard insurance premiums." The insurance on the Cromarties' property lapsed because Carteret failed to apply the funds which it collected for their trust purpose.
To avoid the clear meaning of this language, Carteret points to the mortgagors' covenant to
keep the improvements now existing or hereafter erected on the mortgaged property, insured as may be required from time to time by the Mortgagee against loss by fire and other hazards in such amounts and for such periods as may be required by Mortgagee.... [Emphasis added.]
That language, however, is entirely consistent with the trial court's conclusion. How the property was to be insured, in what amounts, and for what periods were matters to be "required from time to time by the Mortgagee."
If there were any ambiguity in this language, it was dispelled by the parties' consistent conduct between the inception of the mortgage and the lapse of the insurance in 1978. Cf. Joseph Hilton & Associates, Inc. v. Evans, 201 N.J. Super. 156, 492 A.2d 1062 (App.Div. 1985), certif. denied, 101 N.J. 326, 501 A.2d 977 (1985); MacFadden v. MacFadden, 49 N.J. Super. 356, 139 A.2d 774 (App.Div.), certif. denied, 27 N.J. 155, 141 A.2d 828 (1958). (The practical construction that parties give to a contract by their conduct is entitled to great, if not controlling weight in interpreting *97 the contract.) Carteret paid the premiums to Allstate Insurance Company and saw to the annual renewals of the policy. The policies were mailed to Carteret. The periodic statements which Carteret sent to the Cromarties reported on the funds escrowed for the payment of hazard insurance premiums and implied that they were being properly expended. In the light of this history, it would be unconscionable to hold that Carteret had not breached its contract by failing to pay premiums to Allstate[2]. Cf. 24 C.F.R. § 30.320(d) (H.U.D. may impose penalties on a mortgagee who knowingly fails to use escrow funds for the purposes for which they were received.) Reasonable minds could not rationally come to any different conclusion. The trial judge was therefore correct in deciding the issue as a matter of law. Acken v. Campbell, 134 N.J. Super. 481, 342 A.2d 209 (App.Div.), aff'd, 67 N.J. 585, 342 A.2d 172 (1975) (when reasonable men could not differ as to the facts, the conclusion is a matter of law for the judge and may be withdrawn from the jury).
*98 We turn next to Carteret's argument that the trial court committed prejudicial error by allowing plaintiffs to question its former employee, Veronica Errico, about her knowledge of and compliance with HUD regulations pertaining to FHA mortgages, and by telling the jury that those FHA regulations imposed a duty on Carteret toward the Cromarties. The questioning about which Carteret objects included asking Ms. Errico about regulations which require a lender secured by an FHA mortgage to create an escrow account for the payment of insurance premiums and to assure that the premiums were transmitted to the hazard insurer. The opinion was also elicited from Ms. Errico that it was Carteret's obligation to pay the hazard insurance premiums.
Except for some sporadic objections to the form of questions, Carteret did not object on any valid ground to any of this questioning about which it now complains. Furthermore, although Ms. Errico testified about how Carteret dealt with insurance escrows generally and with the Cromarties' escrow account in particular, her testimony about these HUD regulations was not significant. Moreover, since the trial court decided as a matter of law that Carteret breached its contract with the Cromarties by permitting the hazard insurance on their property to lapse without notifying them, Ms. Errico's testimony about HUD regulations was not material to any issue which was submitted to the jury for its decision. If the trial court erred in allowing her to be questioned about the regulations, that is not an error which would warrant our reversing the judgment. See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result....")
The ordinary measure of the Cromarties' damages for the loss which they suffered as the result of Carteret's breach of contract to maintain fire insurance on their house or to warn them of its lapse was the amount that they would have received if appropriate insurance had been maintained in effect. This court stated that *99 rule in Robinson v. Janay, 105 N.J. Super. 585, 591, 253 A.2d 816 (App.Div. 1969):
The damages which may be recovered for breach of an agreement to furnish an insurance policy is the loss sustained by reason of the breach, `the amount that would have been due under the policy provided it had been obtained.' 43 Am.Jur.2d, Insurance, § 174, p. 231. That measure of damages has been consistently applied in actions for breach of agreements to furnish fire or liability insurance, and this whether the action was against a lessee (Marconi Wireless T. Co. of America v. Universal Transp. Co., 194 A.D. 272, 185 N.Y.S. 65 (App.Div. 1920), affirmed 233 N.Y. 581, 135 N.E. 926 (Ct.App. 1922); Franck v. Stout, 139 Wis. 223, 120 N.W. 867, 868 (Sup.Ct. 1909); Jacksonville, M., P. Ry. & Nav. Co. v. Hooper, 160 U.S. 514, 529, 16 S.Ct. 379, [385] 40 L.Ed. 515 (1896); American Trust Co. v. Truck Insurance Exchange, 147 Cal. App.2d 395, 305 P.2d 73, 75 (D.Ct.App. 1957); Benton v. Alcazar Hotel Co., 352 Mo. 836, 180 S.W.2d 33, 39 (1944); 32 Am.Jur., Landlord & Tenant, § 183, p. 176), against a bailee (Lazar v. Cohen, 127 N.J.L. 310 [22 A.2d 414] (Sup.Ct. 1941); Ditmars v. Grand Stores, Inc., 134 N.J.L. 115, 116 [46 A.2d 158] (Sup.Ct. 1946), reversed on other grounds 134 N.J.L. 570 [49 A.2d 286] (E. & A. 1946)), or against an insurance broker (43 Am.Jur.2d, Insurance, § 174, p. 231; Rider v. Lynch, 42 N.J. 465 [201 A.2d 561] (1964); Marano v. Sabbio, 26 N.J. Super. 201 [97 A.2d 732] (App.Div. 1953)).
Under a fire insurance policy of the type which was introduced into evidence in this case, the Cromarties would have been entitled to the replacement cost of the damaged structure if it was replaced or, if it was not replaced, to the diminution in its actual cash value as the result of the fire. The jury was not given any evidence of the cost of repairs. The testimony of plaintiff's expert purported to show the full market value of the property in 1983 and 1988, without any deduction for the value of the land or for portions of the structure which were undamaged. The trial court's jury instructions allowed the jurors to award the Cromarties the entire value of their property in 1988, without any deductions for land or for the portion of the structure that was undamaged.
In their brief to this court, plaintiffs advance the following rationale for permitting their expert to testify about the fair market value of their house in 1988, approximately five years after the fire:
The Cromarties' property was lost after being abandoned by Carteret. Said loss was not occasioned directly by fire damage to the property in question, but by Carteret's cold, calculated business decision....

*100 ... Carteret gave assurances to the Cromarties that the property would be inspected and maintained pending resolution of the hazard insurance issue.
... Carteret abandoned the property without any notice or input from the Cromarties. Contrary to the reasonable expectations of the Cromarties, Carteret failed to pay water or sewer taxes even though there were funds to pay the same in the Cromartie escrow account on the date of the fire. Consequently the City of Newark foreclosed on said property. Carteret made a decision to neither pay the outstanding liens in order to preserve and protect the realty, contrary to HUD rules and regulations, nor to redeem in its capacity as a superior lien holder[3]. Defendant's refusal to promptly address the damages suffered by plaintiffs exacerbated said damages, resulting in the loss of said realty, and all rental income derived therefrom.
In other words, the Cromarties claim that they were entitled to offer evidence of the total value of their property in 1988 and of the gross rents they would have collected for almost ten years after the fire because their loss was caused, not solely as the result of Carteret's breach of its contractual obligation to maintain fire insurance, but also as the result of its breach of a duty to preserve the property after the fire by preventing its foreclosure. The implication of their argument is that the duty to preserve the property from foreclosure was either imposed on Carteret by the HUD regulations or it was voluntarily assumed by Carteret after the fire.
The trial court accepted the argument of Mrs. Cromartie's counsel that the HUD regulations established the standard of care which Carteret violated by permitting the property to be foreclosed. He charged the jury about HUD regulations as follows:
I'd like to also instruct you ladies and gentlemen as to a guideline that is promulgated by or on behalf of the  the HUD, Housing and Urban Development, and constitutes a HUD regulation. `The mortgagee,' this is Section 203.377, `the mortgagee upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date and efforts to reach the mortgagor by telephone within that period have been unsuccessful, the mortgagee shall be responsible for a visual inspection of the security [i.e., mortgaged] property to determine whether the property is vacant. The *101 mortgagee shall take responsible action to protect and preserve such vacant or abandoned security property until its conveyance to the commissioner, if such action does not constitute an illegal trespass.'
We do not agree that the cited HUD regulation establish a standard of care which Carteret owed to the Cromarties. The tenor of the authorizing statute, 12 U.S.C. § 1709, and the context of the cited regulation, 24 C.F.R. 203.377 (see also 24 C.F.R. 203.378), indicate that the regulation is clearly intended for the benefit of the Federal Housing Administration. The purpose of the provision quoted in the trial court's charge is to protect the salvage value of property subject to a mortgage guaranteed by the FHA in order to minimize the agency's loss in the event it is called upon to make good its guarantee and indemnify the mortgagee. There are regulations which are intended to assist a defaulting mortgagor, but that is not the purpose or intended effect of the one quoted by the court in its instructions. The quoted portion of the jury charge was therefore erroneous.
We also reject the Cromarties' alternative contention, that Carteret contractually obligated itself to protect the Cromarties' interests by continuing to pay real property taxes and by paying sewerage and water charges after the fire. The only evidence in the record to support such a finding is the following testimony of Mrs. Cromartie:
Q. Miss Cromartie, after the fire, did Miss Errico give you assurances that they would take care of the property until this issue about the homeowner's policy was resolved?
A. Yes.
Q. Okay. And based on that, did you rely on Carteret to assume responsibility for the property until the issue of the homeowner's policy was resolved within the company?
A. Yes.
This testimony is not a sufficient basis for a finding that Carteret agreed to prevent foreclosure by paying water and sewerage fees, particularly if those charges were incurred while the property was *102 still inhabited, i.e., before the fire[4].
The colloquy between the court and counsel before the case was submitted to the jury suggests that the court may have ruled that the jury could award the Cromarties the 1988 value of their property on the theory that the events which led to its total loss were the foreseeable consequences of Carteret's breach of its contract to maintain fire insurance. Pickett v. Lloyd's, 131 N.J. 457, 621 A.2d 445 (1993), lends some support to that theory. In that case, the Supreme Court held that an insurer which refused or delayed in bad faith to make a payment justly due to its insured could be liable to the insured for consequential economic damages that were fairly within the contemplation of the insurance company, even in an amount which was in excess of the insurance coverage afforded by the policy. Id. at 481, 621 A.2d 445. In Pickett, the consequential damages were measured by the income which the insured had lost while the insurer unjustifiably failed to indemnify him for the loss of a truck which he could not replace without the insurance proceeds.
By analogy, the consequences of Carteret's breach of its contract to maintain hazard insurance on the Cromarties' property could possibly also include liability for consequential damages, including lost income and the increased cost of replacing their house which resulted from inflation during the period while payment was withheld. But that justification is also unsupported by the trial evidence. The record does not disclose whether or not the fire deprived the Cromarties of the financial means to protect their own property from foreclosure and, if it did, whether their financial inability was foreseeable at the inception of the mortgage. Furthermore, the record does not support the finding that Carteret's breach of its duty to pay the fire insurance premiums *103 or warn the Cromarties of the lapse of the policy was committed in "bad faith" within the meaning of Pickett v. Lloyd's, supra.
Carteret also objects to the inclusion of lost rents in the damage award on the ground that the Cromarties did not prove their expenses in operating the property and therefore did not prove their lost profits. We agree. To recover lost profits, a party must show that profits were lost as a result of the actionable conduct complained of. "Lost profits" signifies the difference between gross income and the costs or expenses which had to be expended to produce the income. Proof of the relevant costs or expenses is not a matter of mitigation. It is part of the damage case of the party seeking recovery for lost profits. J.L. Davis & Associates, 263 N.J. Super. 264, 275-77, 622 A.2d 923 (App.Div. 1993) and cases cited therein; 5 Corbin on Contracts § 1023 (West 1964). The failure to require the plaintiffs in the present case to prove their relevant expenses, or to show that their inability to produce the proof was the consequence of Carteret's conduct, was also error.
We next consider Carteret's argument that judgment should have been entered in its favor because the Cromarties would not have been entitled to recover under their Allstate homeowner's hazard policy even if it had been in force at the time of the fire and they therefore suffered no compensable damages. The factual premise of that argument is that between the inception of the mortgage loan and the fire the Cromarties had become divorced, both of them had moved out of the house, and they had let it to rent-paying tenants. The terms of the 1977 insurance policy which was admitted into evidence solely on the issue of damages defined "insured property" in such a way that the homeowner's occupancy of the premises was a condition of coverage. A jury could reasonably have inferred that Allstate's hazard insurance policies which covered the Cromarties' property from 1970 to 1978 probably contained the same provision. Although the Cromarties believed that their homeowners' insurance was being renewed from year to year after they had both moved out of the property, *104 they did not themselves seek, or ask Carteret to seek, a landlords' policy which would not require the owners to live in the insured premises. Therefore, a jury could also reasonably have found that even if Carteret had not permitted the insurance to lapse, the policy which would have been in effect at the time of the fire would also have made coverage dependent on occupancy of the premises by the owner. From that premise, Carteret argues that its breach of its contract to maintain insurance did not cause any compensable damage to the Cromarties because neither of them was living in the house at the time of the 1983 fire and therefore Allstate Insurance Company would not have compensated them for the fire loss even if a policy had been in force.[5]
As a legal proposition, Carteret's argument has considerable force. A party claiming damages for breach of contract has the burden of showing that the breach caused loss or prevented gain. For example, in Lieberman v. Employers Ins. of Wausau, 84 N.J. 325, 341-42, 419 A.2d 417 (1980), a neurosurgeon's medical malpractice insurer was held to have breached its contract with its insured by settling a malpractice claim within the policy limits, but without his consent; as damages for the breach, the trial court awarded the neurosurgeon the amount of the insurance surcharge for which he became responsible because the insurer had paid more than $3500 to dispose of a claim against him. The Supreme Court reversed on damages, holding that the neurosurgeon could not recover unless he proved that, if the insurer had not settled against his wishes, the case would have been disposed of thereafter, either by settlement or by trial for less than $3500; otherwise, he would still have been subject to the surcharge and would not have suffered any damages. Id. at 341-44, 419 A.2d 417. Similarly, in Wolpaw v. General Acc. Ins. Co., 272 N.J. Super. 41, 639 A.2d 338 (App.Div. 1994), a liability insurer appointed one attorney to *105 represent several defendants with potentially conflicting interests in a personal injury action. After having suffered a judgment substantially in excess of the policy limits, one of the insureds sued the insurance company, claiming that it had breached its insurance contract by failing to appoint separate attorneys to represent each of the insured defendants. On the insured's motion for summary judgment, the trial court held that the insurer's failure to provide separate representation was a breach of its insurance contract and that the insurer was therefore liable to pay the entire amount of the personal injury judgment entered against its insured. On appeal, we agreed that the insurer had breached its contract. We disagreed, however, with the award of damages. Id. at 46, 639 A.2d 338. We reversed the case and remanded it for trial on damages, holding that in order to recover damages the insured was required to prove that, but for the insurer's appointment of one attorney to represent defendants with conflicting interests, the insured would have been found liable for no damages or for a lesser amount of damages. Id. at 49, 639 A.2d 338. As applied to the present case, the legal rule illustrated by these cases leads to the conclusion that the Cromarties, as part of their damage case, had the burden of showing that, but for Carteret's failure to pay insurance premiums in accordance with its contract or to warn them of the lapse of their policy because of its failure to pay premiums, they would have been protected against fire loss.
If the Cromarties had been living in the house at the time of the fire, they could have met that burden by introducing the homeowners' policy which had been issued to them when they bought their house in 1970. They could have showed that that policy had been renewed from year to year until Carteret stopped paying premiums, that it would have continued to be renewed if Carteret had continued to pay the premiums, and that, if the policy had been in force in 1983, they would have been entitled to compensation for the fire. However, Ms. Cromartie did not offer the 1970 policy into evidence, although she testified that she had it in her car. Presumably, she did not introduce the policy into evidence *106 because, like the 1977 policy introduced by Carteret, it defined "insured property" in a way that made Mr. or Ms. Cromartie's living in the house at the time of the fire a condition of the insurer's obligation to indemnify them for any fire loss. Since neither of them was living there in 1983, they would not have been entitled to collect indemnification under an Allstate homeowners' policy. Furthermore, although the Cromarties believed that Carteret was using part of their monthly mortgage payment to secure the annual renewal of their homeowners' policy, they did not attempt to obtain a landlords' policy that would have continued to insure them against fire loss after they ceased to live in the house, and they did not request Carteret to do so. Consequently, absent any other relevant evidence, Carteret would have been entitled to a judgment limiting the Cromarties' compensatory damages to nominal damages.
However, there is some evidence in the record to support the argument that the Cromarties were entitled to rely on Carteret to warn them to obtain the appropriate insurance to protect their property when both of them no longer lived there. Ms. Errico, who had been head of Carteret's insurance department at the time of the fire, testified that her department "was responsible for seeing that there was adequate insurance coverage on all properties ... [to] protect[] the borrower and the bank's interest in the event of loss." Carteret's records showed that in 1980 Ms. Cromartie's address was Route 1, Box 134A, Regalwood, North Carolina 28456, and that "sister occupies property." According to Ms. Errico, she hoped that any person she trained who received the information that Ms. Cromartie had moved out of the house, would have warned Ms. Cromartie to change her fire insurance. After the fire, a Carteret officer sent a handwritten memorandum which reads: "This is serious! I suggest: 1) Make Cromartie whole. 2) Draft a response to HUD, pronto, showing how it can't happen again." In addition, the jury could have found from the trial evidence that the renewal policies were sent only to Carteret. In our view, this evidence, although slim, was sufficient to justify denying Carteret's application for a judgment in its favor. Since *107 damage issues will have to be retried on other grounds, we have not decided whether the judgment in the Cromarties' favor could be sustained by presuming a finding by the jury or by the trial judge in accordance with the verdict. See R. 4:39-1[6]; Stella v. Dean Witter Reynolds, 241 N.J. Super. 55, 70-72, 574 A.2d 468 (App.Div.), certif. den. 122 N.J. 418, 419, 585 A.2d 412 (1990). At any retrial of this case, the Cromarties will be free to show, if they can, that Carteret had assumed the responsibility of obtaining hazard insurance for their house that would be effective even though neither of them resided there.
Lastly, we consider the trial court's ruling that, because Carteret was reimbursed by its insurer under a mortgage impairment policy, it was barred from recovering on its counterclaim for the balance of its mortgage loan to the Cromarties. Courts in other jurisdictions have held that the proceeds of insurance which protects the lender against a default on the mortgage must be credited against the debt if the defaulting mortgagor has paid the premiums. See In re Lenz, 110 B.R. 523, 526 (D.Colo. 1990) (for the purpose of determining whether the assignee of a mortgagee was entitled to file a general claim against the mortgagor, which was a debtor in reorganization, the proceeds of insurance against default on the mortgage, whose premiums had been paid by the mortgagor, would be treated as payment on the debt); Platte Valley Sav. by Resolution Trust Corp. v. Crall, 821 P.2d 305, 307 (Colo. App. 1991) (defaulting mortgagor, having paid the premiums for mortgage insurance from which the mortgage debt was paid, *108 would be liable to the insurer as subrogee of the mortgagee, but not to the mortgagee); but see Sandusky v. First National Bank of Sikeston, 299 Ark. 465, 773 S.W.2d 95, 97 (1989) (mortgagee which negligently failed to insure mortgage loan was not liable to the defaulting mortgagor because the proceeds of insurance against default would not have enured to the benefit of the mortgagor). However, the present case is distinguishable from those cases on two grounds. First of all, Carteret alone, not the Cromarties, paid the premiums for its insurance policy. Secondly, its insurance was a mortgage impairment policy which protected it, not against default, but against the loss of its collateral.
Disposition of this case does not require us to decide whether Carteret's receipt of the proceeds of its mortgage impairment insurance bars its counterclaim for the mortgage deficiency. The trial judge correctly determined that there was a breach of Carteret's contractual obligation to maintain fire insurance. As we have already mentioned, the basic measure of the Cromarties' damages is the amount that they would have been entitled to receive under their fire insurance policy if there had been no breach. Robinson v. Janay, supra, 105 N.J. Super. at 591, 253 A.2d 816. According to the terms of their mortgage and the policies procured in accordance with it, the fire insurance proceeds would have been applied to pay off their mortgage debt to Carteret. Only the balance would have been paid to the Cromarties. Therefore, if the Cromarties prove that they are entitled to be put in the same position as if Carteret had maintained fire insurance on their property, Carteret will be obligated to treat their mortgage debt as satisfied and to pay them, in addition to any consequential damages which they may be able to prove, the amount which they would have been entitled to receive under the policy. This measure of damages moots Carteret's counterclaim[7].
*109 The judgment appealed from is therefore reversed and the case is remanded to the Law Division for a new trial, solely, however, on issues of damages.
NOTES
[1] Before the fire, Carteret had assigned the mortgage to Federal Home Loan Bank of New York. Carteret was the servicing agent. If Federal Home Loan Bank of New York was the mortgagee when suit was instituted, the claim for the unpaid balance of the mortgage loan should have been asserted in its name.
[2] In Carteret's brief to us, it relies on three decisions of New York's Appellate Division which hold that under circumstances similar to those of the present case the mortgagee was not liable to its mortgagor for failure to maintain hazard insurance. See Fairfax v. Dime Savings Bank of Williamsburg, 152 A.D.2d 503, 544 N.Y.S.2d 826 (App.Div. 1989); Beckford v. Empire Mutual Insurance Group, 135 A.D.2d 228, 525 N.Y.S.2d 260 (1988); Boyce v. National Commercial Bank & Trust of Albany, 41 Misc.2d 1071, 247 N.Y.S.2d 521 (N.Y. Sup. Ct.), aff'd 22 A.D.2d 848, 254 N.Y.S.2d 127 (1964), leave to appeal denied, 15 N.Y.2d 487, 260 N.Y.S.2d 1027, 208 N.E.2d 790 (1965). Carteret also notes that a Fourth Department case, Pacheco v. Heussler, 56 A.D.2d 85, 390 N.Y.S.2d 761 (1976), held under similar circumstances that the mortgagor was liable.

We note that there appears to be a split of authority among jurisdictions throughout the country on the liability of a mortgagee for failure to maintain insurance or to notify the mortgagor of its imminent lapse. See Annotation, Duty of Mortgagee of Real Property with respect to Obtaining or Maintenance of Fire or Other Casualty Insurance Protecting Mortgagor, 42 ALR 4th 188 (1985). Some of the apparently conflicting cases are distinguishable from one another on their facts. Some reflect the differing views of different courts on issues of public policy. In the light of the facts of the present case, particularly the language of the mortgage and the past practice of the parties, we are not persuaded by the New York cases cited to us by Carteret which take a view different from ours.
[3] Carteret's mortgage was subordinate to Newark's liens for taxes, water and sewerage charges. N.J.S.A. 54:5-8, -9.
[4] As previously mentioned, we cannot tell from the record whether the liens which Newark foreclosed were for unpaid real estate taxes, which Carteret arguably was obligated to pay, or for sewerage or water charges, which were not its responsibility.
[5] Mr. Cromartie moved out of the property in 1973 or 1974; Mrs. Cromartie, in 1978. Carteret stopped paying premiums some time in 1978. The record does not show whether the policy lapsed before or after Mrs. Cromartie moved out.
[6] R. 4:39-1. Special Verdicts

The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact.... The court shall instruct the jury concerning the matters submitted as is necessary to enable it to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issues so omitted unless before the jury retires he demands its submission to the jury. The court may make a finding as to an issue omitted without such demand, or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.
[7] There may be one possible outcome of a retrial which would not moot the question of whether the Cromarties owe Carteret the unpaid balance of their mortgage or whether they are entitled to credit for the payment which Carteret received under its mortgage impairment policy. Conceivably, the evidence could show that the Cromarties would not have been entitled to recover under their homeowners' insurance, that Carteret was not obligated to procure, or warn them to procure, other insurance which did not require their residence at the insured premises, but that Carteret breached its agreement to protect the property after the fire from foreclosure by Newark. Because the question is speculative at this point and was not briefed, we have not attempted to decide whether the Cromarties would be liable for the unpaid balance of the mortgage in that factual context.