860 A.2d 992 (2004)
373 N.J. Super. 135
Wendy ZUIDEMA and John Zuidema, Plaintiffs-Respondents-Cross-Appellants,
v.
James J. PEDICANO, M.D. and James J. Pedicano, M.D., P.A., Defendants-Appellants-Cross-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 2004.
Decided November 24, 2004.
*994 Leonard Rosenstein argued the cause for appellants-cross-respondents (Vasios, Kelly & Strollo, attorneys; Mr. Rosenstein, on the brief).
Thomas L. Ferro argued the cause for respondents-cross-appellants.
Before Judges PETRELLA, PARKER and YANNOTTI.
The opinion of the court was delivered by
PETRELLA, P.J.A.D.
Defendants James J. Pedicano, M.D. and James J. Pedicano, M.D., P.A. appeal from an adverse jury verdict of $150,000 in an action originally instituted by plaintiffs Wendy and John Zuidema as a malpractice action, but which was amended to assert additional claims of sexual assault and "medical negligence." This appeal presents the issue of whether sexual relations by a physician with a patient can be considered medical malpractice or "medical negligence" as opposed to an assault where the medical malpractice claims were dismissed before trial and the jury found no sexual assault. Plaintiffs[1] cross-appeal the judge's calculation of prejudgment interest using the filing date of the amended complaint.
On appeal defendants argue: (1) plaintiff's claim of sexual assault was a new claim unrelated to her malpractice claim and was time-barred; (2) it was error to permit plaintiffs to rely on N.J.A.C. 13:35-6.3 on their negligence claim; (3) it was error to instruct the jury on "medical negligence" and include that term on the verdict form as to the sexual assault aspect; and (4) there was no medical testimony of any permanent damages. Defendants seek entry of judgment in their favor, or alternatively, ask that if there is a remand for a new trial that the jury's finding of no sexual assault not be disturbed.
In 1996, Zuidema lived in Pine Bush, New York and worked part time at Valley Hospital in Ridgewood, where Dr. Pedicano had staff privileges. Zuidema, then about thirty-eight years old,[2] went to see Dr. Pedicano at his Ridgewood office for swelling and pain in her hand from picking up her baby. At that first visit, Dr. Pedicano advised her that the swelling would go away and further treatments were not required.
In early May 1997, Zuidema met Dr. Pedicano in a hallway at Valley Hospital and showed him a lump that had developed on her wrist. He told her that the lump was a ganglion cyst and suggested she call his office to schedule a same-day surgical procedure. Zuidema scheduled surgery for Thursday, June 5, 1997. However, by the middle of May the lump had disappeared, *995 and when she saw Dr. Pedicano in the hallway of Valley Hospital, she told him that she wanted to cancel the surgery because her wrist condition had improved. Later that day, Zuidema again met Dr. Pedicano in the hallway and commented that "there must be some sort of karma." This time Dr. Pedicano told her that she should have the surgery anyway to prevent the lump from returning. On Dr. Pedicano's advice, Zuidema decided to continue with the wrist procedure.
On May 30, Zuidema went to Dr. Pedicano's office for a pre-surgery physical and brought her then-eighteen month old baby along. A brief conversation ensued and Dr. Pedicano allegedly asked Zuidema if she meant her "karma" comment at Valley Hospital. The question caused such a reaction on Zuidema's face that Dr. Pedicano apologized, and jokingly said "I hope you're not going to sue me for sexual harassment." After Zuidema assured him that she would not, he began the physical, but she said he seemed nervous and his hands were shaking.
Zuidema testified that the conversation then turned to Dr. Pedicano's marriage, his marital problems, and that one of his friends was leaving his wife to marry his girlfriend. Zuidema responded that one of her previous doctors was leaving his wife to marry his nurse. After the physical, Zuidema left the office.
On June 5, 1997, Dr. Pedicano performed the surgery on Zuidema's wrist. Zuidema testified that while being prepped for the procedure, Dr. Pedicano leaned over and said she "was the most beautiful patient he had ever operated on." After the procedure, Zuidema was placed in an enclosed area for post-operative patients, where Dr. Pedicano visited her and began talking about personal interests, including bicycle riding.
Dr. Pedicano gave Zuidema a business card with his home phone number and private voice mailbox number, and joked "[i]n case you want to leave me dirty messages." Nonetheless he looked down his scrubs and said "I better stop this before I get into trouble." Zuidema believed he was looking towards his penis as a sexual innuendo.
Zuidema called the next day to schedule a post-operative check-up and she said Dr. Pedicano told her that Monday would be too late to remove the bandages, which only left Saturday. Zuidema went by herself to the checkup on Saturday, June 7, 1997.
When Zuidema arrived at Dr. Pedicano's office, she observed that the other doctors' secretaries were there. Dr. Pedicano led Zuidema to an examination room toward the rear of his office. Zuidema could not remember the chronological sequence of what occurred next and could only remember flashes of the events, but recalled when they were both in the room, Dr. Pedicano embraced her and began kissing her. She could not remember how long the kiss lasted, but she was finally able to tell him not to kiss her. She stated that Dr. Pedicano did stop kissing her, but then reached under her shirt and began touching her breasts. Zuidema said she wanted to leave the room but was in shock.
She testified that Dr. Pedicano pushed her down by the shoulders to perform oral sex on him and forcefully inserted his penis into her mouth. However, she soon came to her senses, and told him she could not do it. She did notice that he had a scar on his stomach and no hair on his chest. After the incident, Dr. Pedicano talked about his sex life and a vasectomy, and changed her wrist bandages. She left his office shortly thereafter, sat in her car and cried.
*996 According to Zuidema, the events of that day affected her relations with her husband. She said she did not have these problems before the incident and required therapy from four different doctors and medication. Her son and husband testified that Zuidema had changed significantly after the incident and did not want to be touched or hugged. No expert witnesses testified for the plaintiffs, either as to any standard of medical care or as to Zuidema's damage claims.
Dr. Pedicano's office manager testified that it was normal post-operative treatment procedure for patients to return to the office one to three days after the procedure. However, she stated that Dr. Pedicano normally did not have Saturday hours and he would only see a patient on Saturday on special occasions. Before she took any appointments for a Saturday visit, she would check with the doctor and would never let the caller speak directly with the doctor. She also stated that Dr. Pedicano's staff advised patients not to drive if their hand was bandaged.
Dr. Pedicano denied having any sexual relations with Zuidema, or making comments to her regarding karma or asking whether she was going to sue him for sexual harassment or talking about his sex life. He admitted having a post-operative scar on his abdomen from the treatment of an ulcer and having had a vasectomy fifteen years ago, but did not know how Zuidema knew that. He confirmed that he had very little chest hair, and attributed Zuidema's knowledge of that fact to pictures in his office and to the open scrubs that he wore. He admitted giving Zuidema his phone numbers, but stated that he did so solely to help her and her husband, who was unemployed at the time.
The doctor said he accepted Zuidema's Saturday follow-up appointment because she told him that her children had medical appointments the following week. However, he believed Zuidema would have someone else drive her. He contradicted Zuidema's account of what happened in the examination room. According to him, Zuidema attempted to kiss him at the very end of the office visit and he rejected her advances, stating "I don't think this is a good idea." Afterwards, he felt uncomfortable and they walked out of the office together.
Although Zuidema asked to come in on another Saturday, a second follow-up visit was scheduled for June 18, 1997, a weekday, to avoid having the same problem. The second follow-up visit was routine. Zuidema did not mention this second follow-up visit in her testimony.
Although the medical malpractice claim relating to Zuidema's wrist surgery was dismissed, on the second day of trial the judge ruled that Zuidema stated a "cause of action for medical negligence based on common knowledge"[3] and that medical expert testimony was not necessary to establish a standard of care. The judge also stated that he would instruct the jury on the New Jersey Administrative Code sections that forbid medical professionals from having sexual relations with their patients. N.J.A.C. 13:35-6.3. The judge was of the view that the evidence presented only supported two factual versions of the events: the assault either happened or it did not. The case was considered to have only two remaining issues: whether there was medical negligence and whether there was assault and battery. During the jury charges, the judge instructed the jury on medical negligence and read the cited section of the administrative code pertaining *997 to conduct by doctors, indicating that the regulations "set up the standard of conduct for physicians." The judge also instructed the jury on the law of assault and battery.
The jury found that Zuidema did not show by a preponderance of the evidence that Dr. Pedicano assaulted and battered her.[4] However, the jury unanimously found that Dr. Pedicano was medically negligent. One juror voted that Zuidema's injuries were not proximately caused by the negligence. The jury awarded $150,000 to plaintiffs for medical negligence.

I.
An important threshold issue discussed at oral argument is whether Zuidema was entitled to assert a claim for "medical negligence" against Dr. Pedicano based upon the sexual assault allegation. The issue has important public policy implications.[5] "It is, of course, the responsibility of the courts to determine the scope of tort liability." President v. Jenkins, 357 N.J.Super. 288, 313, 814 A.2d 1173 (App. Div.2003), aff'd in part, rev'd in part on different grounds, 180 N.J. 550, 853 A.2d 247 (2004).
There is no doubt that plaintiffs could assert a tort of sexual assault or assault and battery independent of any malpractice claim. The essence of plaintiffs' medical negligence claim is that Dr. Pedicano's alleged assault was not within the standard of care that physicians owe their patients. The issue is squarely framed by the procedural posture of the case in that all malpractice claims based on the hand surgery were dismissed for lack of expert support. Therefore, the remaining issues for trial revolved around the sexual incident alleged.
We are aware of no case in this State that allowed or disallowed a medical negligence claim, presumably based on an unintentional act, premised on sexual assault, an intentional act. Rather, the cases involving sexual assault generally are in the context of denial of coverage by malpractice carriers due to an intentional act of the accused physician. See, e.g., Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 698 A.2d 9 (1997) (sexual assault claim was covered under contractual language of physician's malpractice policy, but not covered due to an exclusion for criminal activities); Hirst v. St. Paul Fire & Marine Ins. Co., 106 Idaho 792, 683 P.2d 440 (App.1984) (physician who operated outside of the mental health arena was not covered under the professional services language of liability policies for sexual assault); Public Serv. Mut. Ins. Co. v. Goldfarb, 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810 (1981) (insurer had duty to defend dentist against claims of sexual abuse where the policy language clearly indicated intent to do so); Physicians Ins. Co. v. Pistone, 555 Pa. 616, 726 A.2d 339 (1999) (insured physician's acts of sexual abuse were outside coverage of professional liability insurance policy); Washington Ins. Guar. Ass'n v. Hicks, 49 Wash.App. 623, 744 P.2d 625 (1987) (sexual acts of a chiropractor during a treatment session were not covered medical incidents under his liability policy). Those cases generally involved disputes between physicians and *998 their insurance carriers over insurance coverage under contract law.
However, no authority in this State or from other jurisdictions allows a claim of sexual assault to support a claim for medical malpractice in a civil action as a matter of tort law. Therefore, the only guidelines available to date are the general principles of a medical malpractice action.
A malpractice action is based on the improper performance of a professional service that deviated from the acceptable standard of care. See Sanzari v. Rosenfeld, 34 N.J. 128, 134-135, 167 A.2d 625 (1961); F.G. v. MacDonell, 291 N.J.Super. 262, 271-272, 677 A.2d 258 (App.Div.1996), aff'd in part, rev'd in part on different grounds, 150 N.J. 550, 696 A.2d 697 (1997); 61 Am.Jur.2d Physicians, Surgeons, Etc. § 287 (2002). In a typical medical malpractice action, a plaintiff must establish by expert testimony the applicable standard of care owed by a physician to a patient, a deviation from that standard of care, and that the deviation proximately caused the injuries. Verdicchio v. Ricca, 179 N.J. 1, 23, 843 A.2d 1042 (2004).
Under the facts of this case, giving plaintiffs the benefit of the inferences, the alleged sexual contact was neither related to nor necessary for any actual medical service Dr. Pedicano may have rendered. He performed the surgery on Zuidema before the incident and he gave post-operative medical care after the incident. Regardless of whether the sexual act or contact occurred, it was independent of any professional service Dr. Pedicano rendered and unnecessary to it. Zuidema asserted a medical malpractice claim because Dr. Pedicano happened to be a physician. A doctor's duty to refrain from sexual misconduct, a separate intentional act, does not give rise to a medical malpractice action, although other potential causes of action might exist. To conclude otherwise and allow a malpractice cause of action in such circumstances would essentially incorporate intentional sexual conduct as a part of a physician's professional service. And, as an intentional act, it generally would not be covered by professional malpractice insurance. See Princeton Ins. Co. v. Chunmuang, supra (151 N.J. at 94-96, 698 A.2d 9).
Furthermore, there is an incongruity in allowing a plaintiff to prove a negligence action based on a defendant's intentional conduct. Plaintiffs asked the jury to conclude that a doctor has a duty not to engage in sexual relations with a patient, and that Dr. Pedicano's willful decision to engage in such conduct constituted a negligent deviation from that duty. Under that rationale, a physician would also have a duty not to steal a patient's property while under the doctor's care and not to falsely imprison his patients in an examination room. While these examples may be common knowledge of improper conduct by anyone, including a physician, or indeed any licensed professional, they are no different than the duties that every individual owes to others and are not the performance of a professional service. If Dr. Pedicano was not a physician, he would still owe the same duty not to sexually assault Zuidema. There is no reported case that we are aware of that has allowed any form of negligence to be proven by a sexual assault, an intentional act. Therefore, Zuidema's medical negligence claim cannot stand independent of any medical malpractice claim and should have been likewise dismissed.[6] Plaintiffs would then be left *999 with a potential claim of negligent sexual assault or contact. Their intentional sexual assault claim was rejected by the jury. No negligent act was established here, let alone what was referred to as medical negligence.
Our decision does not conflict with that in Princeton Ins. Co. v. Chunmuang, which held that an allegation of sexual assault by a patient against her physician constituted a "medical incident." 151 N.J. at 98, 698 A.2d 9. That case interpreted the scope of coverage for a professional liability policy based on contract law principles. Id. at 87, 698 A.2d 9. It also noted that at that time, physicians were not statutorily required to have malpractice insurance. Ibid. N.J.S.A. 45:9-19.17 now makes malpractice insurance for physicians compulsory.
For the sake of completeness, we note that the trial judge ruled that expert testimony was not required to establish Dr. Pedicano's standard of care for what he denominated "medical negligence" because the common knowledge doctrine could be applied. The judge left the jury to rely on their experience, without the aid of an expert, to determine the standard of care that Dr. Pedicano owed Zuidema as to medical negligence and sexual misconduct. However, this ruling undercuts the concept that professional services were involved and that as such the claim had to be that Dr. Pedicano deviated from professional standards.
As stated, in the usual malpractice case, the standard of care is generally established by expert testimony, except where the common knowledge doctrine applies. Rosenberg v. Cahill, 99 N.J. 318, 325, 492 A.2d 371 (1985). Common knowledge comes into play where "the issue of negligence is not related to technical matter[s] peculiarly within the knowledge of the licensed practitioner" and the jury is allowed "to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto." Ibid. (quoting Sanzari, supra (34 N.J. at 141-142, 167 A.2d 625)). The common knowledge doctrine applies where the negligence of the defendant is apparent to "anyone of average intelligence and ordinary experience." Ibid.
In malpractice cases involving common knowledge, "[t]he trial of such a case is essentially no different from `an ordinary negligence case.'" Rosenberg, supra (99 N.J. at 325, 492 A.2d 371) (citing Sanzari, supra (34 N.J. at 141, 167 A.2d 625)). Here, it may well be within the common knowledge of the average juror that physicians should not engage in sexual relations with their patients. But the sexual assault was an intentional act and the jury found no sexual assault. In that sense, if a sexual assault could be a basis for medical malpractice on a common knowledge theory, the terms "medical negligence" and "medical malpractice" would be interchangeable. Here, the claim was of an intentional act, and the jury verdict finding "medical negligence" was fatally inconsistent with the acts of the doctor at issue and requires reversal.
However, the jury could not consider the malpractice claim because that was dismissed. Additionally, it is erroneous to use the term "medical negligence" because it could only refer to a form of malpractice, couched in terms of negligence, or an unintended tort. Here, the *1000 allegations involved intentional sexual activity, not accidental or negligent conduct.
If the jury could determine the standard of care without the aid of an expert, then the clear implication is that the standard of care did not involve any matter within the specialized knowledge of Dr. Pedicano. The alleged sexual assault clearly did not constitute a professional service.
Simply stated, sexual relations between a physician and patient are certainly not condoned, but Zuidema may not utilize a medical malpractice type theory to support a claim based on an intentional act independent of a physician's practice, or for a claim of sexual assault. See Chunmuang, supra (151 N.J. at 100-101, 698 A.2d 9); Ambassador Ins. Co. v. Montes, 76 N.J. 477, 484, 388 A.2d 603 (1978). The jury found that there was no sexual assault, thus rejecting this claim, and the jury incorrectly considered a medical negligence issue because it was improperly based on an intentional act. Thus, we reverse the jury's verdict.

II.
We briefly address Dr. Pedicano's other arguments. He asserts that Zuidema should not have been allowed to amend her complaint to include the sexual assault claim because it was unrelated to the malpractice claim and the statute of limitations had run on the June 1997 claim.
Personal injury claims based on sexual assault, even as an intentional act, are subject to the two-year statute of limitations. N.J.S.A. 2A:14-2. Even though the statute of limitations ran, a claim for sexual assault may be brought in amended pleadings if it relates back to the original pleading filed prior to the running of the statute. R. 4:9-3. The claim in the amended pleading, however, must arise "out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading...." R. 4:9-3. Furthermore, the trial judge "may, upon terms, permit the statement of a new or different claim or defense in the pleading." R. 4:9-3.
Although the limitations period on the sexual assault claim arguably expired in June 1999, that claim related back to the original complaint because the event occurred during the timeframe of the treatment involving the medical procedures referenced in the malpractice claim, i.e., the surgery Dr. Pedicano performed on Zuidema's hand. The amended claim related to an alleged sexual incident. The motion judge was not required to sort out the niceties of the malpractice claim and consider whether there would be expert proofs or whether an intentional act was involved. Harr v. Allstate Ins. Co., 54 N.J. 287, 299-300, 255 A.2d 208 (1969). So long as the claims alleged implicated the same transaction or occurrence, regardless of the merits, a liberal application of the rule allowed Zuidema to amend her pleadings to include her sexual assault claim.

III.
Dr. Pedicano argues that the judge erred in charging the jury on sections of the New Jersey Administrative Code related to sexual misconduct of physicians, N.J.A.C. 13:35-6.3(c), (d), and (i), adopted pursuant to the authority of N.J.S.A. 45:9-2.
The sections of the administrative code the judge read to the jury state in pertinent part:
(c) A licensee shall not engage in sexual contact with a patient with whom he or she has a patient-physician relationship. The patient-physician relationship is considered ongoing for purposes of this section in all contexts other than the provision of psychiatric or psychotherapeutic *1001 services, unless: actively terminated, by way of written notice to the patient and documentation in the patient record; or the last professional service was rendered more than one year ago....
(d) A licensee shall not seek or solicit sexual contact with a patient with whom he or she has a patient-physician relationship and shall not seek or solicit sexual contact with any person in exchange for professional services....
(i) A licensee shall not engage in any other activity (such as, but not limited to, voyeurism or exposure of the genitalia of the licensee) which would lead a reasonable person to believe that the activity serves the licensee's personal prurient interests or is for the sexual arousal, the sexual gratification or the sexual abuse of the licensee or patient.
[N.J.A.C. 13:35-6.3.][7]
The appendix following N.J.A.C. 13:35-6.3, states:
It is beyond dispute that sexual contact with patients is in conflict with the very essence of the practice of medicine.... It is well established that sexual activity between physicians and patients is almost always harmful to the patient and is prohibited.
Violations of the administrative code provisions could result in suspension or revocation of a license to practice medicine. See N.J.S.A. 45:9-16,[8] which was in effect at the time of the events at issue in this appeal. Current medical ethical standards and administrative regulations forbid sexual contact between physicians and patients. N.J.A.C. 13:35-6.3. As such, although physicians generally owe a duty not to engage in sexual relations with their patients, such a duty is not part of any professional medical service. A claim of a sexual offense committed by a physician is relevant in administrative proceedings for admission to medical practice, license suspension, or license revocation. See N.J.S.A. 45:1-21; N.J.A.C. 13:35-6.3; In re Polk, 90 N.J. 550, 449 A.2d 7 (1982).
Our courts have recognized both the availability and unavailability of administrative regulations as evidence of a standard of care. See, e.g., Fisch v. Bellshot, 135 N.J. 374, 385, 640 A.2d 801 (1994) (dram shop regulations do not create a negligence standard for alcoholic beverage servers and licensees); Harris v. State, 61 N.J. 585, 593, 297 A.2d 561 (1972) (prison regulations related to the conduct of prison employees are not evidence of the standard of care owed to prisoners); Costantino v. Ventriglia, 324 N.J.Super. 437, 442, 735 A.2d 1180 (App.Div.1999), certif. denied, 163 N.J. 10, 746 A.2d 456 (2000) (OSHA regulations are evidence of the *1002 standard of care for the construction industry); Cromartie v. Carteret Sav. & Loan, 277 N.J.Super. 88, 101, 649 A.2d 76 (App.Div.1994) (HUD regulations are not evidence of a standard of care). There is no published opinion that has addressed the applicability of the quoted regulation in the context of a medical malpractice claim.
In our view, reliance on the administrative code to establish a deviation from medical care is inappropriate. It establishes an ethical rule of conduct, by defining a bad practice and prohibiting such conduct. See Baxt v. Liloia, 155 N.J. 190, 714 A.2d 271 (1998).
Although sexual assault by a physician against a patient may constitute a crime or another type of tort, it does not constitute professional malpractice because it simply does not constitute a legitimate professional service and is not made a negligent act by the regulations.

IV.
Dr. Pedicano contends that the trial judge erred in using the term "medical negligence" in his instructions to the jury.
The judge allowed the case to be presented to the jury as a negligence-type action against a physician, despite the intentional nature of the conduct, leaving the standard of care up to the jury without any expert testimony. The judge erred in doing so and instructing the jury that the Board's regulation established a standard of care or conduct. The judge further erred in permitting the jury to find negligence based solely on a violation of a regulation of the Board of Medical Examiners. This allowed the regulation to become the sole basis for civil liability. That was improper. N.J.A.C. was not intended to establish a standard of civil liability. Rather, it established an ethical standard to guide the Board of Medical Examiners in its licensing and disciplinary determinations. N.J.A.C. 13:35-6.3 (appendix); 28 N.J.R. 65(a).
In an analogous context, Baxt, supra (155 N.J. at 203, 714 A.2d 271), held that the rules of professional conduct (RPC) for attorneys do not, in and of themselves, provide the basis for civil liability. A violation of an RPC can be considered as some evidence of negligence when taken into consideration with other evidence of negligence. Aside from the fact that in this case there was no negligent act alleged, the judge in his instruction told the jury that it would find negligence by the doctor based solely on N.J.A.C. 13:35-6.3, which was improper.

V.
Dr. Pedicano also asserts that expert testimony was required on the issue of the permanency of damages and seeks judgment in his favor without a remand. In light of our decision, the issue is moot.
Our decision also makes it unnecessary to address defendant's contention that in the event of a remand the issue of the sexual assault should not be revisited. In any event, we note that the issue of sexual assault was decided by the jury and was a distinct issue from any negligence claim. See Ahn v. Kim, 145 N.J. 423, 434-435, 678 A.2d 1073 (1996).

VI.
Zuidema's cross-appeal as to whether prejudgment interest should have been calculated from the date of the filing of the original complaint on May 19, 1999, rather than the May 3, 2002 date of the amended complaint is also moot.
Reversed. Remanded for entry of judgment of no cause for action.
NOTES
[1] References to Zuidema or plaintiff in the singular refer to Wendy Zuidema unless otherwise indicated. John Zuidema, Wendy's husband, asserted a per quod claim.
[2] At the time of the trial in 2003, Zuidema was forty-five years old and had been married for twenty-five years. The Zuidemas have five children, ranging from age seven to twenty-four.
[3] Medical malpractice is essentially a negligence or incompetence claim against a physician. See Black's Law Dictionary, 7th Ed.1999, p. 971.
[4] Whether the verdict could be considered a finding by the jury that Dr. Pedicano and Zuidema had a consensual sexual relationship was not resolved. The trial judge did comment in passing that the incident may have been consensual.
[5] The contours of a medical malpractice suit become more significant for members of the bar, health professionals, and malpractice insurers, because physicians in this State are now statutorily required to carry malpractice insurance. N.J.S.A. 45:9-19.17.
[6] To allow a malpractice claim based on a sexual relationship would also create a number of troubling issues where the patient consented, i.e., whether the patient contributed to the cause of her alleged injuries, whether the physician's insurance company was required to defend the action even though it was based on an intentional act, see Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 698 A.2d 9 (1997), and whether an affidavit of merit would be required, see N.J.S.A. 2A:53A-27.
[7] In addition, N.J.A.C. 13:35-6.3 states:

(j) Violation of any of the prohibitions or directives set forth at (c) through (i) above shall be deemed to constitute gross or repeated malpractice pursuant to N.J.S.A. 45:1-21(c) or (d) or professional misconduct pursuant to N.J.S.A. 45:1-21(e).
[8] Under the former N.J.S.A. 45:9-16(h), repealed by L. 1999, c. 403, effective January 18, 2000, the Board of Medical Examiners could revoke or suspend a doctor's license for "gross malpractice or gross neglect in the practice of medicine which has endangered the health or life of any person." Under the now applicable statutory provisions of N.J.S.A. 45:1-21(c), (d), and (h), as amended, revocation is permitted if the professional:

c. Has engaged in gross negligence, gross malpractice or gross incompetence which damaged or endangered the life, health, welfare, safety or property of any person;
d. Has engaged in repeated acts of negligence, malpractice or incompetence;
* * *
h. Has violated or failed to comply with the provisions of any act or regulation administered by the board[.]