NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1610-13T4

WILSON BERMUDEZ,

     Plaintiff-Respondent,

v.

KESSLER INSTITUTE FOR
REHABILITATION,

     Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **January 8, 2015**
>
> **APPELLATE DIVISION**

Argued October 22, 2014 — Decided January 8, 2015

Before Judges Alvarez, Waugh, and Carroll.[1]

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Union County, Docket No. L-4077-12.

Walter F. Kawalec, III, argued the cause for appellant (Marshall, Dennehey, Warner, Coleman & Goggin, attorneys; Mr. Kawalec and Ryan T. Gannon, on the briefs).

Samuel Tsinman argued the cause for respondent (Forman, Cardonsky & Lawrence, attorneys; Mr. Tsinman, on the brief).

The opinion of the court was delivered by

WAUGH, J.A.D.

---

[1] Judge Carroll did not participate in oral argument. However, with consent of the parties he has joined in this opinion. R. 2:13-2(b).

By leave granted, defendant Kessler Institute for Rehabilitation (Kessler) appeals the Law Division's August 23, 2013 order denying its motion for partial summary judgment with respect to claims alleging violations of the Nursing Home Responsibilities and Rights of Residents Act (Nursing Home Act), N.J.S.A. 30:13-1 to -17, and federal regulations governing nursing homes. It also appeals the October 11, 2013 order denying its motion for reconsideration. For the reasons explained in this opinion, we reverse.

I.

We discern the following facts and procedural history from the record on appeal.

In November and December 2010, Bermudez was a patient at Kessler's West Facility, located in West Orange. He had been transferred there from Overlook Hospital on November 19, at which time he had an "unknown diagnosis of generalized progressive weakness with intermittent dystonic spasmodic/dystonic movement of the upper extremities."

Upon admission, Bermudez' treatment plan included an "inpatient comprehensive interdisciplinary rehabilitation program to address [his] impairments and medical conditions . . . while assessing equipment needs and compensatory strategies, with coordinated interdisciplinary services that

[would] include physical therapy, occupational therapy, and close monitoring and treatment with 24-hour rehabilitative nursing." The "interdisciplinary program [was to] be performed under the direction of a physiatrist."

The admitting doctor characterized Bermudez' "inpatient hospital rehabilitation stay [as] medically necessary to achieve important health and functional goals," adding that Bermudez required "frequent physician visits, 24-hour rehabilitation nursing, and a coordinated intensive rehabilitation program . . . to address complex medical, nursing, and rehabilitation needs." According to the admission report, the "estimated length of stay" was "[t]hree to four weeks." Bermudez was discharged on December 24, five weeks after his admission.

In November 2012, almost two years after his discharge, Bermudez filed a six-count complaint against Kessler. He alleged that, while at Kessler's West Facility, he "sustained injuries including but not limited to unnecessary falls and fractures." Although the complaint also premises liability on common law negligence, the legal theories involved in this appeal are based on alleged violation of the Nursing Home Act and the following federal regulations: 42 C.F.R. §§ 483.5, 483.13(c)(2), 483.20(b) and (d), 483.25, and 483.30(a)(1).

In July 2013, Kessler moved for summary judgment on counts one, two, and five of the complaint, as well as all other claims for damages premised on the Nursing Home Act or the federal regulations. Kessler argued that the West Facility was a comprehensive rehabilitation hospital, rather than a nursing home. The issue of whether the West Facility is a "nursing home" within the meaning of the Nursing Home Act is significant, in large part, because the Act allows the recovery of treble damages and attorneys' fees by a successful plaintiff, N.J.S.A. 30:13-4.2, -8, relief which would not be available in a traditional negligence action.

On August 23, following oral argument, the motion judge denied Kessler's motion, finding that Kessler was "a nursing home" within the meaning of N.J.S.A. 30:13-2(c).[2] The motion judge denied Kessler's subsequent motion for reconsideration. We granted leave to appeal.

II.

On appeal, Kessler argues that the motion judge erred in determining that the West Facility is a nursing home for the purposes of N.J.S.A. 30:13-2(c) and therefore subject to the provisions of the Nursing Home Act, including enhanced recovery

---

[2] Although the judge denied the entire motion, he did not specifically address the federal regulations in his oral decision or his decision denying reconsideration.

such as treble damages and attorneys' fees. Bermudez counters that, although the West Facility may be licensed as a comprehensive rehabilitation hospital, it is nevertheless subject to the Nursing Home Act because it meets the Act's broad definition of nursing home.

A.

We review a grant of summary judgment under the same standard as the motion judge. Rowe v. Mazel Thirty, LLC, 209 N.J. 35, 41 (2012). "[T]he legal conclusions undergirding the summary judgment motion itself" are reviewed "on a plenary de novo basis." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 385 (2010). The issue before us is whether, as the motion judge found, an institution such as a comprehensive rehabilitation hospital is covered by the Nursing Home Act because of the breadth of the Act's definition of "nursing home," especially when read liberally because of the Act's remedial nature. It is a purely legal issue subject to our plenary review.

In construing a statute, our "overriding goal is to determine as best we can the intent of the Legislature, and to give effect to that intent." State v. Hudson, 209 N.J. 513, 529 (2012).

> When interpreting a statute, our main
> objective is to further the Legislature's

5

intent. To discern the Legislature's intent, courts first turn to the plain language of the statute in question. In reading the language used by the Legislature, the court will give words their ordinary meaning absent any direction from the Legislature to the contrary. If the plain language leads to a clear and unambiguous result, then [the] interpretive process is over.

Where the plain meaning does not point the court to a clear and unambiguous result, it then considers extrinsic evidence from which it hopes to glean the Legislature's intent. Included within the extrinsic evidence rubric are legislative history and statutory context, which may shed light on the drafters' motives. Likewise, interpretations of the statute and cognate enactments by agencies empowered to enforce them are given substantial deference in the context of statutory interpretation.

[TAC Assocs. v. N.J. Dep't of Envtl. Prot., 202 N.J. 533, 540-41 (2010) (alteration in original) (citations and internal quotation marks omitted).]

Regarding overbroad statutes, the Court has stated:

Courts are cautioned against rewrit[ing] a plainly-written enactment of the Legislature or presum[ing] that the Legislature intended something other than that expressed by way of the plain language. If the language is clear on its face, courts should enforce [the statute] according to its terms.

However, where a literal interpretation would create a manifestly absurd result, contrary to public policy, the spirit of the law should control. Thus, we have held that when all is said and done, the matter of statutory construction . . . will not justly turn on literalisms, technisms, or the so-

6

called formal rules of interpretation; it will justly turn on the breadth of the objectives of the legislation and the commonsense of the situation. Accordingly, when a literal interpretation of individual statutory terms or provisions would lead to results inconsistent with the overall purpose of the statute, that interpretation should be rejected.

[Perrelli v. Pastorelle, 206 N.J. 193, 199-201 (2011) (alterations in original) (citations and internal quotation marks omitted).]

B.

The Nursing Home Act defines a "nursing home" as

any institution, whether operated for profit or not, which maintains and operates facilities for extended medical and nursing treatment or care for two or more nonrelated individuals who are suffering from acute or chronic illness or injury, or are crippled, convalescent or infirm and are in need of such treatment or care on a continuing basis. Infirm is construed to mean that an individual is in need of assistance in bathing, dressing or some type of supervision.

[N.J.S.A. 30:13-2(c).]

There appears to be no dispute that Kessler's West Facility, which is licensed by the New Jersey Department of Health and Senior Services (Department), is a comprehensive rehabilitation hospital. A "rehabilitation hospital" is defined by N.J.A.C. 8:33-1.3 as

a hospital licensed by the Department to provide comprehensive rehabilitation

> services to patients for the alleviation or amelioration of the disabling effects of illness. Comprehensive rehabilitation services are characterized by the coordinated delivery of multidisciplinary care intended to achieve the goal of maximizing the self-sufficiency of the patient. A rehabilitation hospital is a facility licensed to provide only comprehensive rehabilitation services or is a distinct unit providing only comprehensive rehabilitation services located within a licensed health care facility.

"Comprehensive rehabilitation" is defined as "services offered by a licensed rehabilitation hospital and characterized by the coordinated delivery of multidisciplinary care intended to achieve the goal of maximizing the self-sufficiency of the patient." Ibid.

The description of a nursing home in N.J.S.A. 30:13-2(c) does not, in our opinion, clearly and unambiguously include a comprehensive rehabilitation hospital, as described in N.J.A.C. 8:33-1.3. The two types of facility are commonly understood to be different entities.

In outlining the "significant differences in the patients, the health-care providers, and the institutional structures of nursing homes and hospitals," our Supreme Court made the following observations:

> First, residents of nursing homes are a particularly vulnerable population. Nursing-home residents are often quite elderly, with an average age of eighty-two

nation-wide. Most suffer from chronic or crippling disabilities and mental impairments, and need assistance in activities of daily living. The vast majority of patients who enter a nursing home will eventually die there, and their illnesses and deaths will be viewed as consistent with their advanced age and general infirmity.

Second, nursing-home residents are often without any surviving family. More than half have no surviving parents, siblings, or children. Their social isolation is severe. Many never have visits from anyone and few ever spend nights away except for medical reasons. Thus, the involvement of caring family members . . . may not be a realistic possibility for many nursing-home residents.

Third, physicians play a much more limited role in nursing homes than in hospitals. The Subcommittee on Long-Term Care of the Senate Special Committee on Aging states that physicians visit their patients in nursing homes infrequently, and then for only brief periods of time. According to the Subcommittee, physicians avoid nursing homes because of the general shortage of physicians, the low priority for elderly citizens in medical education, the red tape and low reimbursement associated with Medicare and Medicaid, the shortage of trained "backup" personnel in nursing homes, the emphasis on acute care in American medicine, the depressing environment in many nursing homes, and the disincentives of time and travel. The "missing physician" is the general rule in nursing homes. . . .

Fourth, nursing homes as institutions suffer from peculiar industry-wide problems to which hospitals are less prone. . . .

. . . .

9

> Finally, nursing homes generally are not faced with the need to make decisions about a patient's medical care with the same speed that is necessary in hospitals. Hospitals are called upon for urgent care, and treatment decisions in that context must be made quickly. Nursing homes, in contrast, care for individuals whose lives are slowly declining and for whom treatment issues arise more gradually and are foreseeable longer in advance.
>
> [In re Conroy, 98 N.J. 321, 374-77 (citations omitted) (1985).]

In addition, five years prior to the enactment of the Nursing Home Act in 1976, the Legislature used the more generic term "health care facility" to encompass entities such as "a general hospital, special hospital, . . . , rehabilitation center, extended care facility, skilled nursing home, nursing home, [and] intermediate care facility." L. 1971, c. 136, § 2 (codified as N.J.S.A. 26:2H-2).

To determine whether the Legislature nevertheless meant to include comprehensive rehabilitation hospitals in the Nursing Home Act, we turn to its legislative history. That history begins with the passage of a concurrent resolution for the creation of "a commission to inquire into the condition of the nursing homes and the personal care facilities for the aged in [New Jersey]." S. Con. Res. 15 (1974). The resolution noted that

[n]ursing homes and personal care facilities for the elderly have proliferated greatly in recent years as a result of the increasing proportion of aged persons in the population and the inability of our modern mobile society to offer to the aged the secure position in a family group which was traditional in the former years; and,

. . . The growth of the nursing home industry has received extraordinary impetus since the coming of Medicare and Medicaid programs, which have made available considerable funds for the provision of such services; and,

. . . The growth of this industry has been accompanied by allegations regarding the condition of the nursing homes and the personal care facilities for the aged in this State; and,

. . . It is incumbent upon the Legislature to determine to what extent, if any, these allegations are based on fact; and,

. . . While this situation is currently the subject of several Congressional investigations, primary responsibility for regulation and supervision of these facilities rests with State Government.

[Ibid.]

The duty of the Nursing Home Study Commission (Commission), as it came to be known, was

to conduct a thorough inquiry into the current condition of the nursing homes and the personal care facilities for the elderly in [New Jersey], including the organization, operation, standards and policies of such facilities, the adequacy of such facilities to the social needs of the State, the

sufficiency of the State's standards for the regulation and supervision of such facilities and of the implementation and enforcement thereof.

[Ibid.]

The ultimate goal of the Commission was "to make definite recommendations for legislative and administrative changes." Personal Care Facilities For the Elderly in New Jersey: Hearing Before the Nursing Home Study Comm'n, 1-2 (Apr. 16, 1975) [hereinafter Hearing] (statement of Sen. John J. Fay, Jr., Chairman, Nursing Home Study Comm'n). To that end, the Commission held four public hearings "to listen to those concerned with nursing homes and the care of the elderly." Nursing Home Study Comm'n, Interim Report 3 (1976).

In her testimony before the Commission, Joanne Finley, M.D., the Commissioner of Health at the time, pointed out that "institutionalized long-term care is provided in [New Jersey] in a variety of health facilities, not just nursing homes. There are long-term care units in special hospitals, general hospitals, intermediate care facilities, homes for the aged and a number of different names." Hearing, supra, 4-5 (statement of Joanne Finley, M.D., Comm'r of the State Dep't of Health). She described how those types of facilities were regulated differently depending on whether they received federal funding in the form of Medicare or Medicaid. Id. at 5. Concerning

"nursing homes in the generic sense," only intermediate care facilities, skilled nursing facilities, and homes for the aged were eligible for participation in the federal programs. Ibid. Thus, facilities that did not receive funding were not being regulated in the same way as facilities that did.

In a written statement submitted to the Commission, Finley listed seven types of facilities that provide long-term care. Statement on Long-Term Health Care Services & Facilities Presented to New Jersey Nursing Home Investigation Comm'n by Joanne E. Finley, M.D., M.P.H., State Commissioner of Health, 2-3 (Apr. 16, 1975). They were: nursing homes (also known as SNFs, i.e., skilled nursing facilities), intermediate care facilities (ICFs), homes for the aged (also classified as skilled nursing facilities), government medical institutions, special hospitals, general hospitals, and facilities for the mentally disabled. Ibid. Of the seven, Finley considered nursing homes, intermediate care facilities, and homes for the aged to be "nursing homes in the generic sense." Id. at 3. She added:

> The Intermediate Care Facility (ICF) is, in actuality, a nursing home in all respects except that, the required intensity of nursing care (measured in terms of nursing hours per patient per day) is less than that in a nursing home. In nursing homes, which are called Skilled Nursing Facilities (SNF), the requirement is 2.75 nursing hours per

patient per day. In ICF's the patients are evaluated as requiring either Level "A" care (2.5 hours) or Level "B" care (1.25 hours). . . .

> Homes for the Aged are "combination" facilities which are usually sponsored by religious or fraternal groups. One section of the Home will house residential beds for the elderly and these beds are classified as Sheltered Care Boarding Home Beds. There is also an infirmary section in the Home which provides skilled nursing care and this section is classified as a SNF.

[Ibid.]

In its statement to the bill that eventually became the Nursing Home Act, the Health and Welfare Committee of the Senate described the statute's purpose as follows:

> Residents of nursing homes are all too often given inferior treatment because they are old, feeble or poor. They are in need of a bill of [rights] similar to the bill recently passed by the Legislature and signed into law, enumerating certain rights of the mentally ill.

> This bill not only declares that nursing home residents have certain rights; it also lists a number of responsibilities that nursing homes have with regard to the care of residents.

> The Federal government has established clear standards of care for residents of skilled and intermediate care nursing facilities who are Medicaid or Medicare recipients. However, this bill makes similar standards of care applicable to all nursing homes and nursing home residents in the State and, moreover, makes such

> standards an expression of legislative policy and intent.
>
> [Senate Institutions, Health and Welfare Committee, Statement to S. 944 (1976).]

We glean from the history leading up to introduction of the legislation and the Senate committee's statement that, although the Legislature wrote a broad definition of "nursing home," it nevertheless intended to limit the statute's reach to nursing homes and similar facilities. The Legislature set out to study nursing homes, as generally understood, and ended the process by enacting legislation to address the problems it found with respect to nursing homes and similar facilities. For that reason, it used "nursing home" in the title of the Act and the definitional section, which it expanded to encompass the types of similar facilities outlined by Finley in her testimony.

The legislative history contains nothing from which we can conclude that the Legislature sought to include an entity such as a comprehensive rehabilitation hospital. Had the Legislature intended to apply the requirements of the Nursing Home Act to institutions such as comprehensive rehabilitation hospitals, it would undoubtedly have used a more inclusive term than "nursing home," such as "health care entity," in the title and text of the legislation.

A-1610-13T4

For the reasons explained above, we hold that a comprehensive rehabilitation hospital, such as Kessler's West Facility, is not a "nursing home" within the meaning of N.J.S.A. 30:13-2(c) and, as a consequence, is not subject to the provisions of the Nursing Home Act.[3]  We reverse the motion judge's denial of summary judgment on that issue and remand for entry of summary judgment as to all claims premised on the Nursing Home Act and further proceedings consistent with this opinion.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] Neither the motion judge nor the parties adequately addressed the issue of the federal regulations.  As a result, we express no opinion as to their applicability, if any.  See Zuidema v. Pedicano, 373 N.J. Super. 135, 151-52 (App. Div. 2004) ("Our courts have recognized both the availability and unavailability of administrative regulations as evidence of a standard of care."), certif. denied, 183 N.J. 215 (2005).

A-1610-13T4